**FILED**

Roger Gifford
15226 Hornbrook Rd.
Hornbrook, CA 96044
530-340-1395

JAN 21 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK                    DEPUTY CLERK

THE UNITED STATES DISTRICT COURT
IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Roger Gifford, | Case No: 2:21-cv-119-JAM-AC  PS |
| Plaintiff, | **COMPLAINT** |
| | **(JURY TRIAL REQUESTED)** |
| vs. | ACTION AT LAW FOR CIVIL RIGHTS |
| | VIOLATIONS;; FEDERAL SAFE |
| Michele Hanson; Robert Puckett, Sr.; Melissa | DRINKING WATER ACT and CLEAN |
| Tulledo; Patricia Brown; Kevin Dixon; Clint | WATER ACT; |
| Dingman; Julie Bowles; Hornbrook | PENDENT STATE CLAIMS |
| Community Services District; and, John Does | |
| 1-50 | REQUEST FOR DECLARATORY AND |
| Defendants, | INJUNCTIVE RELIEF |
| | |
| | USC 42 §§1983, 1985, 1986, and 1988, |

## I. JURISDICTION

1. Jurisdiction over this action arises pursuant to Sections 1331, and 1343 of Title 28 of the United States Code, as arising under the Constitution and laws of the United States, specifically Amendments 1, 4, and 14 of the United States Constitution; the Clean Water Act ("CWA"); the Safe Drinking Water Act ("SDWA"); and, sections 1983, 1985, 1986, and 1988, of Title 42 of the United States Code, as an action seeking redress of grievances for violations of rights and privileges secured to Plaintiff by the Constitution and Laws of the United States. Supplemental jurisdiction (Section 1367) is asserted over Plaintiff's pendent state law claims for relief, and violations of the Hornbrook Community Services District ("HCSD") Bylaws. This action is also brought in the name of all persons similarly situated to Plaintiff, and as provided by the HCSD Bylaws at Section A-9(26).[1] Times material to this complaint are <u>October 24, 2019 through and including February 24, 2020</u>. All allegations in this complaint either occurred during, or were ongoing conduct involving, this time period.

2. The named Defendants are primarily the Directors, employees, contractors, and/or

---

[1] A true copy of the HCSD Bylaws, adopted and ratified on April 18, 2014 has been concurrently lodged, and <u>are incorporated herein.</u>

agents of Defendant Hornbrook Community Services District ("HCSD" or "District" herein), a public agency within the County of Siskiyou, State of California, created, and at all times material operating, as an independent special district[2] under the laws of the State of California and of the United States, as well as its own duly adopted Bylaws, and subject to their jurisdiction.  Some "John Doe" defendants include customers of the HCSD who have wrongfully received waivers, and/or reductions, of fees, assessments, and/or other charges without any lawful process, as well as various contractors and other purported agents who have received "no bid" contracts in violation of the HCSD Bylaws, and all of whose true names, and specific involvement in each wrongful scheme, are not yet known.

3.  The HCSD was at the times material to this complaint governed by a Board of Directors ("the Board")[3], and collectively referred to herein as "the Board Defendants"; as well as by an "Operator", Kevin Dixon ("Dixon"); and, a bookkeeper/accountant, Julie Bowles ("Bowles").  Bowles and Director/Secretary Michele Hanson create all of the customer billing, charges, and assessment documents for the HCSD based upon information collected and provided by Defendant Clint Dingman ("Dingman").

4.  Plaintiff Roger Gifford is a taxpayer, elector, and citizen of Siskiyou County, California, and of the HCSD, and resides within their boundaries.  As such, Plaintiff is entitled to be provided HCSD Board meeting agendas and materials as provided by the Brown Act; to be provided access to public records as provided by the California Public Records Act ("CPRA"); to be allowed to connect to the HCSD water supply upon payment of due fees and charges and on the same basis as any other resident of the District, and to vote on certain HCSD-wide issues as provided in the Bylaws.  Plaintiff is also a former member of the Board, and so entitled to worker's compensation coverage for injuries he suffered arising from his duties as a Director.  Concerning Plaintiff's pendent state claims herein, Plaintiff certifies that he timely and properly provided written notice(s) of his claims to the HCSD in full compliance with all  requirements of the **California Government Tort Claims Act**, Government Code sections 905[4], 910, and 915.  Plaintiff gave notice of all law violations alleged herein, and made his CPRA and Brown Act requests/notices in writing to the Defendants.  The HCSD never responded in any way to

---

[2] Special Districts are primarily controlled by California Government Code sections 61000, *et seq.*
[3] Composed of Defendants Michele Hanson ("Hanson"), Secretary; Robert Puckett ("Puckett"), President; Patricia Brown ("Brown"), Director; and, Melissa Tulledo ("Tulledo"), Director.
[4] The HCSD took no action on the claims (incorporated herein), and failed to respond to Plaintiff's claims (see CA Govt. Code 910.8; 911; *Martinez v. County of Los Angeles*, 78 Cal.App.3d 242, 245 (1978)).

Plaintiff's claims, requests, or notice(s) as required by law.

5. The HCSD, and Board Defendants, as part of an ongoing wrongful agreement and plan to manage the HCSD as a spoils system[5] and to retaliate against Plaintiff for his Constitutionally protected conduct of political and legal activity in opposition to them[6], during the time material to this complaint, acted to: systematically and wrongfully stifle, deny, suppress, and thwart, Plaintiff Gifford's Right to Vote, as well as his Petitioning, Due Process and Equal Protection rights concerning certain California Statutory schemes (i.e., Brown Act and CPRA); after wrongfully imposing rate hikes in the District[7], diverted funds collected for water service away from the production of water, and the construction and maintenance of the water infrastructure, to improper uses such as private lawyers[8] and other things; failed to appoint a General Manager for the District as required by Government Code §§61050 and 61051 (and the HCSD Bylaws), while instead exercising the powers thereof themselves (individually and/or in concert) in violation of Government Code §61040(e) (and the HCSD Bylaws); used their positions to deny and seize Plaintiff's due benefits to worker's compensation, including reimbursement of medical expenses - as well as to deny him any opportunity for notice of or opportunity to be heard on such denial and/or seizures[9]; and, used their positions to deny Plaintiff the right to hook up real property and dwellings under his dominion and control to the water distribution system of the HCSD.

6. These Defendants agreed, and acted to do these things by wrongfully ignoring State statutory, and State and Federal Constitutional mandates, and the HCSD Bylaws - particularly those voter control provisions thereof. The Defendants wrongful agreement and actions were

---

[5] There are no budgeted costs/expenditures for upgrades, maintenance, or expansion. The Board Defendants, Bowles, and "HCSD" routinely, and wrongfully/illegally, give some customers discounts, tax and fee waivers, reduced water charges, penalty waivers, rule exemptions, etc.

[6] At times prior to those material to this complaint, Plaintiff has brought several legal actions in State Superior Court, and the Third District Court of Appeals, against the HCSD and its minions on the basis of Brown Act and CPRA violations. He has prevailed in the Siskiyou County Superior Court in the following cases #15-1392, 16-1088, and 16-1293. he has prevailed in the Third District in cases #C084757, C085606, C085836, C086031.

[7] That is, not only in violation of the provision of the HCSD Bylaws, but and/or in violation of Proposition 218 and Water Code §11455. See also *Beaumont Investors v. Beaumont Cherry Valley Water District* (1985) 165 Cal.App.3d 227 (water fee must be shown not to exceed service cost, else it is a special tax requiring voter approval under Prop. 13).

[8] Normally, the HCSD and its officers and employees are represented in legal actions by the County Counsel free of charge.

[9] Meanwhile, the Board Defendants routinely granted indemnification to themselves and other purported employee/agents of the HCSD, so discriminated against, and treated Plaintiff differently than any other similarly-situated person.

furthered by their executed plans concerning: engaging in public business of the HCSD (including contractor registration for notification of jobs, scopes of work, bidding and contracts provisions) in manners that were unlawful; failing to hold and/or give proper notice of open and public meetings of the Board of Directors of the HCSD; failing to comply with the Brown Act's requirement that Board of Director's meeting agendas and "agenda packets" be furnished prior to each meeting upon request; acting to thwart and chill speech and petitioning (and attempted petitioning) activity concerning protected conduct and matters of public importance by the public and Plaintiff - including utilization of the California Public Records Act ("CPRA"), and bringing legal actions for CPRA and/or Brown Act violations; the improper, unlawful, and discriminatory imposition and/or waivers of fees, charges, and assessments as to customers of the HCSD; changes to rates for residential water service that failed to comply with the mandatory voter approval portions of the Bylaws; providing public notices, information, and documents concerning HCSD operations/functions to favored customers and associates, but not to Plaintiff; and, a general failure while operating the HCSD and acting as government officers to follow health and other water district-related laws - resulting in health and safety nuisances and other torts.

7. The Board Defendants and their agents also acted wrongfully and/or illegally during the times material to this Complaint, to: hold improper meetings that violated the provisions of the Brown Act concerning notice(s)[10] to the public and to Plaintiff; failing and refusing to post timely, complete, and proper agendas; failing and refusing to provide, or timely provide, complete agendas and agenda packets when requested by the public and Plaintiff; wrongfully waive, reduce, or change fees and charges for certain HCSD customers in violation of the Bylaws and their fiduciary duties; fail to collect "standby" and "availability" fees as required by the HCSD Bylaws and Resolutions; divert water fees and charges from repair and maintenance of the water system to a private lawyer[11]; act in concert to deny the right to vote of the electors of the HCSD and of Plaintiff; refuse and fail to properly, timely, completely, and/or often at all, respond to Plaintiff's multiple CPRA requests in the manner required by law; by concealing and/or destroying HCSD public records; by failing to maintain the rates and works of the HCSD in a manner consistent with the requirements of the Water Code, Health and Safety Code, and

---

[10] Inclusive of meetings and actions of the Board, but also as to individual items that may have been listed on some Agendas insofar as they were insufficient as a matter of law.

[11] These acts are violations of Proposition 218, and Water Code §11455.

Community Services District Law; and, by failing to act as mandated by the HCSD Bylaws, pursuant to Sections A-1.4, A-2.2, A-2.6, A-2.10; A-3.3; A-3.8; A-5-1; A-6.1; A-6.4; A-7; A-9(3); A-9(11); A-9(13); A-9(14) A-9(26); 1-2.020; 1-2.090; 1-2.100; 1-3.010; 1-4.010; 1-4.040; 1.5010(a), 1-5.020, 1-5.030.  These acts also violated the Board Defendants' and agents' fiduciary duty to the HCSD, and residents of the District who depend on HCSD's water supply.

8.  The HCSD and Board Defendants deliberately acted on multiple occasions to interfere with Plaintiff's rights to: speak at public meetings[12]; petition the HCSD concerning HCSD matters; and to vote, while preventing exercise of that right by Plaintiff and the electors of the District, insofar as the HCSD Bylaws mandate voter control over the waiving, imposing, or changing of rates, assessments, fees, penalties, charges, and certain policies of the HCSD.  The sections of the Bylaws granting voter approval over certain actions also specifically state that they cannot be deleted or altered by the Board without voter approval[13].  The HCSD and Board Defendants have also failed and refused to respond as required by law to Plaintiff's multiple CPRA requests, and on many occasions refused to provide Plaintiff with Agendas and Agenda Packets upon request as provided by the Brown Act - but while doing so for other persons.

9.  At all times material, the Board Defendants[14] along with the aid, assistance, encouragement, and/or ratification of the other named defendants as detailed herein, wrongfully "called" and/or engaged in dozens of meetings as the Board of the HCSD (or simply exercised the powers thereof individually, in an *ultra vires* manner), and at each of those meetings improperly and wrongfully took actions, and implemented policies and procedures, in violation of the Bylaws, State laws[15], and public policy, - in a manner that was specifically calculated to obstruct, chill, and deny Plaintiff and the public, the rights to vote[16], assemble, petition, and/or speak on matters of public concern, all without any notice or other due process of law.

---

[12] By refusing and failing to provide notice of those meetings, and/or of individual items considered and/or acted upon by the Board - and documents relating thereto to Plaintiff as requested, the Defendants willfully acted to exclude Plaintiff or his designated representative from attending them.

[13] See HCSD Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, 1-5.030.

[14] Plaintiff is informed and believes that some of the supposedly official acts, including assignment of executive, and/or *ex parte* and/or *ultra vires* power to Puckett and/or Hanson, were actually unilaterally taken by Hanson and/or Puckett outside of any <u>official</u>, properly noticed or agendized Board meetings - for the purpose of concealing such unilateral acts from the public, and Plaintiff, and to prevent opposition to those wrongful acts via direct petitioning activity, and the voter control provisions of the HCSD Bylaws.  Such acts also violate the provisions of the Brown Act, and Govt. Code section 61045.

[15] Notably Government Code §§61045 and 1090, the <u>Health and Safety Code</u>, and the SDWA.

[16] As to those matters requiring voter approval set forth in the HCSD Bylaws.  See fn.4.

10. All claims made herein are brought against the natural person defendants in their individual, as well as their official capacities as provided by law, and the circumstances of each of the claims made against them[17].

11. By naming the Board Defendants and the HCSD as co-Defendants, Plaintiff has intended to comply with the provisions of California Government Code 815.3 throughout each applicable cause of action herein, whether specifically set forth, or implied in the recitation of factual allegations.

12. At all times material, each of the Defendants (including John Does), individually, jointly, and severally, were the agents, partners, joint venturers, aiders, abettors, employers and employees, officers, directors, board members, ostensible agents, principals, co-conspirators and/or partners of one another. All Defendants acted pursuant to policies, customs, and practices of the HCSD adopted by the Board Defendants, its administrators or other directors, operators, employees, contractors, and/or agents. (See also California Govt. Code §815.3.)

13. Each of the Defendants caused and is responsible for the herein-described wrongful, unlawful, and/or tortious conduct resulting injuries by: personally agreeing to and participating in the conduct or acting jointly, aiding, abetting, or conspiring with others who did so; by authorizing, ratifying, encouraging, agreeing with, acquiescing in, or setting in motion, policies, plans, or actions, that led to the wrongful conduct, or, actions although lawful themselves, were in furtherance of other, unlawful, wrongful, and/or tortious conduct while knowing the ultimate goals of the agreements to do so were wrongful; by failing to take action to prevent the unlawful, wrongful, and/or tortious conduct described in the complaint; and, by failing and refusing with deliberate indifference to Plaintiff's rights to conform their conduct to that dictated by the laws of the United States, the State of California, and/or the HCSD Bylaws.

14. In doing the acts alleged herein, the Board Defendants, Bowles, Dixon, Dingman, and, John Does 1 through 50, were acting in their official capacity as elected officials and/or public employees/officers, or as a direct agent[18] of an elected official or District officer, and/or

---

[17] That is, certain Defendants (including at least some John Does) are alleged to be "state agents" for USC 42 Section 1983 liability due to concerted and coordinated planning and action undertaken with the actual officers and employees of the HCSD, and thereby acting under color of law of public offices.

[18] Plaintiff intends the term "direct agent" to also apply to HCSD customers or property owners within the District boundaries who were participants in, and/or erstwhile beneficiaries of, any wrongful or illegal conduct of the Board Defendants, Dingman, and/or Bowles by having their water fees, rates, assessments, water usage and/or other charges wrongfully reduced, redetermined, waived, unbilled, unrecorded (e.g. by

"jointly engaged" with a public officer or official while engaging in the alleged conduct, or were acting under color of such authority as HCSD employees, officers, or agents thereof.

15. Although reference is made herein to events and/or circumstances occurring at meetings of the Hornbrook Community Services District ("HCSD"), by its Board, and/or concerning any Defendant's wrongful purported: authoring of HCSD documents; representations during legal actions of the HCSD, Board Defendants, Bowles, Dingman, and/or Dixon; and, instructions to, and/or agreements with, the Board Defendants (individually or as a group), Dingman, Dixon, and/or Bowles occurring in part at any private, or purportedly "closed session" public meeting of the HCSD Board; it is not Plaintiff's intention to base any state law, or common-law tort, cause of action or request for relief, upon any actual filing or statement in a court of law, or before any lawfully convened tribunal; or, to base any such claims upon any statement or other expression of First Amendment rights occurring by any person at any public proceeding, or lawful meeting of any public entity.

## VII. THE HORNBROOK COMMUNITY SERVICES DISTRICT

16. The HCSD has a long history of systemic and chronic administrative and operational dysfunction, as well as dilapidated and inadequate facilities that violate Clean Water Act[19] and Safe Drinking Water Act[20] requirements. All Board Defendants, as Directors of the HCSD (and thus the HCSD itself) should reasonably have been, and were, fully aware of their duties and responsibilities under: the CWA; the CPRA, the SDWA; the Health and Safety Code; the Government Code, the Water Code; and, other applicable Federal and State drinking water-related laws and duties, including those of: notification to the public; to set and collect proper rates sufficient to maintain and improve the water system (and without diversion to non-production expenses); and, prudent financial stewardship of the District's resources, but the

---

failure to read water meters), falsely billed, or rescheduled by one or more of the Board Defendants, Dingman, and/or Bowles without the voter approval required by the HCSD Bylaws, or other due process.
[19] 33 USC §§1251, et seq. The HCSD during the time period material to this Complaint, knowingly, wrongfully, and illegally permitted outflow of one of its wells containing prohibited levels of salts and boron, and allowed Chlorinated water to spill freely from one of its storage tanks ("Tank 2") into a ravine. These outflows flow untreated into Rancheria Creek, Cottonwood Creek, and the Klamath River. Each of those bodies contains protected fish and bird species, and the Klamath is a Wild and Scenic waterway.
[20] See 42 USC Chapter 6A; 42 U.S.C. §300j-8; 40 CFR 141-143; Health and Safety Code §§106877, 106878[20], 106878(b), 106885, and 116745. The HCSD's water production, treatment, and distribution equipment is obsolete, and does not meet the requirements of the Act, while the HCSD, at the times material to this Complaint, permitted uncertified and unlicensed (and/or deficiently certified/licensed) Operators, contractors, and other workers on its water systems in violation of Federal and State law.

Board Defendants herein, and HCSD, have willfully/recklessly failed to comply therewith[21].

17. Additionally, Defendants Dixon, Dingman, and Bowles while aware of the duties of the HCSD and Board Defendants, and have agreed with, conspired, aided, and abetted the HCSD and Board Defendants in violating provisions of the laws of the United States, and of the State of California, relating to the CWA, SDWA, the Health and Safety Code, the Water Code, the Government Code, the Brown Act, the CPRA[22], the Elections Code, the Public Contracts Code, the Uniform Construction Costs Accounting Act, Administrative Rules and Regulations relating to all of these laws, and the HCSD's own Bylaws, with the additional agreement and common goal to thwart any attempt by Plaintiff or the other electors of the District to exercise the rights of petition, assembly, protest, and to vote as afforded in the Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, 1-5.030. The HCSD failed to supervise, train, and/or control, its Directors, as well as employees and contractors Bowles, Dixon, and Dingman, so violations of law, and Plaintiff's rights by those persons, would not occur.

18. Insofar as allegations in this complaint are made against the "Board Defendants", and/or the individual Board Defendants in their official capacities, it is also Plaintiff's intention to apply those allegations to the HCSD. The Board Defendants' acts (and those acts committed by any other Defendant at their individual or collaborative instruction) as those acts constituted the official policy, procedures, customs, practices, and acts of the HCSD itself.

## IX. DEFENDANT JULIE BOWLES.

19. Plaintiff incorporates the general information contained in paragraphs 1-16, and 23-27 as if fully set forth at this point. At all times material, Defendant Julie Bowles ("Bowles") was an independent contractor who held herself out as an officer, employee, and/or agent of the HCSD, was a citizen of Siskiyou County, California, and was also acting under the color of law and of her office as Bookkeeper, of the HCSD.

20. Bowles agreed with, aided, abetted, and assisted the Board Defendants, Dixon, and

---

[21] The HCSD has failed and refused to establish rates and charges meeting the requirements of Water Code sections 31007, and 71616, and failed to take any reasonable action to collect overdue accounts.
[22] The Board Defendants have each agreed amongst themselves to institute a wrongful and illegal policy, custom, and practice of the HCSD of either outright refusing to respond to Plaintiff's CPRA requests in the manner required by law, and/or by providing responses that are not in compliance with the law. Plaintiff alleges that he has submitted multiple CPRA requests during the relevant time period that have not been responded to, or which were incompletely/improperly responded to by the HCSD during the times material to this Complaint. Such policies and procedures violate Plaintiff's rights to notice and other due process under the CPRA's statutory scheme. Plaintiff seeks declaratory and injunctive relief for these wrongful acts (via Govt. Code §61006(c) and otherwise), in addition to the relief provided under the CPRA.

Dingman, in the wrongful conduct alleged herein (but particularly in violations of the Brown Act) by improperly meeting with them individually and serially (by phone, email, and/or at her office in Yreka, CA and other places), as a group (or acting as the "hub" for "spoke and wheel" meetings, and/or a link in the "chain" of daisy-chain meetings thereof), for the purpose of discussing (and agreeing to act on) official HCSD-related "public business", in violation of the Brown Act and the California Constitution, and outside of any noticed, public meetings (including a failure to notice, or hold any such meetings in a proper closed session). Bowles also assisted the various wrongful acts and conspiracies of the Defendants by use of the US Mail to send false documents to customers of the HCSD, and by destroying various HCSD documents[23].

21. Bowles also specifically conspired with, aided, abetted, and assisted the Board Defendants and Dingman with the improper diversion of HCSD public funds to Dingman by issuing Dingman "paysheets" - calculations of amounts purportedly owed to Dingman, the EDD, the State of California (for taxes), and the Federal Government (for taxes and Social Security, etc) by the HCSD as submitted by Dingman on "timecards". The paysheets generated by Bowles for the Board Defendants and Dingman were thus breakdowns of purported wages for services, but which services (as well as rate of pay, and number of hours claimed each month) had not officially been approved by the Board of the HCSD at any public meeting, and/or which services were not actually performed by Dingman (and so falsely claimed[24]), and/or which ultimate paychecks were for amounts in excess of the amounts called for by Dingman's employment contract with the District[25], and/or which he was otherwise rightfully or legally entitled to.

22. Bowles also aided, abetted, assisted, encouraged, agreed to participate in, and ratified the wrongful acts and goals of the Board Defendants to: wrongfully divert public funds of the HCSD to her own benefit via non-contracted for indemnifications and defenses in legal matters[26]; improperly divert HCSD funds to Hanson's private legal matters; failing to properly impose fees and water charges as to themselves, friends and acquaintances of the Board

---

[23] Such as bills containing incorrect charges, notices, waivers, etc. Bowles also participated in the scheme by the Board Defendants to deny Plaintiff the same information and access to government that other customers of the HCSD enjoyed by failing to respond to Plaintiff's requests and notices.

[24] This includes Dingman's claims for time in excess of that which it took him to actually perform tasks he did perform, as well.

[25] No changes to Dingman's employment contract, rate of pay, cap on hours to be worked, etc was ever publicly noticed, or approved by the HCSD Board, yet Dingman claimed the excess pay, and additional hours, each day of the times relevant to this Complaint.

[26] In addition to no provision in contract for such benefits, asserting such an arrangement violated Water Code §11454(b)(2).

1  Defendants, and to certain customers[27] via the monthly billing and otherwise[28]; falsifying the
2  HCSD records concerning those customers' accounts as directed by Hanson, and/or Puckett, in
3  order to conceal the improper under billing, fee waivers, waiving of late fees and other non-
   compliance fees; by waiving or failing to even bill for actual (metered) water use for certain
4  HCSD customers; and, by failing to impose and collect the "standby" and/or "availability" fees
5  as to each parcel in the District as provided by law and mandated by the HCSD Bylaws - all as
6  directed by Hanson, and/or Puckett. Some of the goals of these acts were to specifically deny
7  Plaintiff and the other electors of the District due process, right to petition, and right to vote on
   these issues as provided in the Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010;
8  1.5010(a), 1-5.020, 1-5.030, and was done additionally done in retaliation for Plaintiff's exercise
9  of his rights to free speech and to petition (via court actions) concerning the HCSD.

10      23. The foregoing described acts and failures by Bowles resulted in substantial lost
11  income to the HCSD, and were a breach of her fiduciary duty as bookkeeper/accountant of the
    HCSD, while the act of paying her to do these wrongful acts constituted a waste, and/or illegal
12  expenditure of public funds. Plaintiff is thus entitled to seek compensation on behalf of the
13  District pursuant to Code of Civil Procedure 526a, and the HCSD Bylaws at Section A-9(26).

14  ## X. DEFENDANT CLINT DINGMAN

15      24. At all times material, Defendant Clint Dingman ("Dingman") was an officer,
16  employee, and/or agent of the HCSD, and was acting under the color of law of his office as
    Systems Operator, shift operator, watermaster, and/or water plant operator, as well as an agent of
17  the Board Defendants and/or the HCSD, and resided at the HCSD water treatment facility in
18  violation of the Siskiyou County camping ordinance.

19      25. During all times material, Defendant Dingman, in agreement with the other
20  Defendants, and in furtherance of the mutual wrongful goals with the Board Defendants, Bowles,
21  and Dixon, as set forth in their respective sections, has: helped create and submit false

22
23  [27] This action would also thus be providing assistance to the Board Defendants in their common plan to
    ignore, and violate, the provisions of Water Code §31007, 11455, and 71616, and the HCSD Bylaws.
24  [28] For instance, Bowles would fail to charge commercially-zoned or utilized property at the commercial
    rate, and fail to charge customers for multiple habitable structures, or reduce the set rates for certain
25  residential customers, upon the instruction of the Board Defendants acting as a group (but without the
    voter approval required by the Bylaws), or by Hanson and/or Puckett individually, and/or would modify
    the billing for certain residential and/or commercial customers to wipe out past billing at the proper rate.
    Also, Bowles failed to initiate the processes called for in the Bylaws for collecting on delinquent,
    overdue, and/or tenant accounts - including liens. All such acts occurred without the voter approval of the
    electors required by the Bylaws.

Complaint - 10

government documents[29]; acted to falsify, withhold from Plaintiff[30], and/or destroy public records and government documents to prevent scrutiny and accountability for himself, the HCSD and the Board Defendants; failed to comply with the Clean Water Act, the Safe Drinking Water Act, and the Bylaws of the HCSD relating to the uncontained outflow of toxic water from "well #3" and as to his own qualifications for employment in his positions[31] within the District; failed to comply with the duties and responsibilities imposed upon him by the HCSD Bylaws at Sections A-4, A-5-1, and A-7; failed to take and pass treatment[32] examinations offered, and required by, the California Department of Health in order to lawfully operate HCSD facilities; refused and failed to permit inspection by the public during normal business hours of the records concerning water production and treatment as required by the California Public records Act, as well as records of his time supposedly spend working for the HCSD (aka: "timecards", although the HCSD has no time-clock) kept at the HCSD facilities; has falsified his timesheets to get paid for work he did not do, and for extra time it did not take him to do what he claims he did; has wrongfully acted to prevent enforcement of the Bylaws, State and Federal laws relating to water production, and the CPRA as to him by Plaintiff; failed to maintain and lawfully use the "creek diversion" of the HCSD and associated water rights - jeopardizing the HCSD's diversion rights with the State, and the supply of water to Plaintiff's residence; added excessive, illegal, and toxic amounts of Chlorine to the water system; permitted the illegal outflow of Chlorinated water from "Tank 2" into the drainage of the Klamath River; illegally resided at the HCSD water plant; and, in agreement with the Board Defendants, Dixon, and HCSD, failed to read the meters of all the HCSD customers each month so that due and proper fees and charges might be collected.

38. The Board Defendants knew of, willfully permitted, and encouraged each instance of the aforementioned wrongful acts by Dingman. Further, the Board Defendants failed to insist on training for him, and/or that he comply with any and all HCSD Bylaws, contractual obligations, and/or State laws concerning certification for, and lawful and/or proper operation of, the water facilities, as well as permitting the ongoing violation of the Clean Water Act represented by the

---

[29] To the HCSD files, and to the California State Water Board concerning water production/treatment.
[30] Concerning requests made by plaintiff pursuant to the CPRA regarding water production/treatment.
[31] Dingman, in operating the water production, treatment, and distribution facilities without proper "treatment operator" certifications by the State of California, is acting in violation of Health and Safety Code sections 106875, and 106885, and 22 California Code of Regulations sections 63765 and 63770.
[32] Dingman did finally take the test for, and obtain the "D-1" certification license from the State of California in November of 2014 (which certification was expired and void asst all times material). That is not sufficient to apply chemicals to the water system, however, even when valid.

discharge of "Tank 2", and well #3 contaminated water into the environment.

39. Dingman has agreed, conspired, and wrongfully acted with Hanson, Puckett, Dixon, and other the Board Defendants, by occupying the HCSD water treatment plant as a daily residence, storage unit for Dingman's personal items, and habitat, along with his dog, without the payment by Dingman for the use of electricity, or use of the facilities otherwise.

40. Dingman received an wrongful, improper, and illegal pay increase, and extra hours, without any action by the Board of the HCSD approving such, as an improper gift of public funds[33]. Dingman also produced false "timesheets" and false claims of hours worked.

41. During the times material to this Complaint, Dingman, with the agreement, aid, encouragement, and assistance of the Board Defendants, and Dixon, has routinely, repeatedly, and ongoingly applied incorrect types and dosages of chemicals to the HCSD's water treatment and distribution system, and failed to make legally required notifications to the public, and the State Water Board, concerning excessive Chlorine dosage (>4.0mg/L) he applied to the system.

42. The foregoing acts of wrongful, illegal, reckless, unsafe operation of the water production, treatment, and distribution facilities of the HCSD[34] , and Dingman's residence at the water plant, is willfully negligent, unlawful, and a nuisance[35].

## XI. DEFENDANT KEVIN DIXON

42. At all times material, Defendant Kevin Dixon ("Dixon") was purportedly a consultant for the HCSD, an independent contractor for the position of the Chief Systems Operator for the HCSD, an employee and/or agent of the HCSD and the Board Defendants, the purported supervisor of Defendant Dingman, and acting under color of authority of those offices. On information and belief, Plaintiff alleges Defendant Dixon is a resident and citizen of Shasta County, California, and was undertaking his contract and employment as a purported "independent contractor" with the HCSD in Hornbrook, California without having any business license to do so from Siskiyou County.

43. Dixon, in purportedly acting as the "Chief Operator" and "Operator of Record" for the water treatment facilities of HCSD, had statutory duties to regularly inspect, oversee, supervise, perform, and directly control the daily operation of the water treatment plant and

---

[33] Cal. Const., Art. XVI, § 6; Cal. Const., Art. IV, § 17; Govt. Code §8314.
[34] See 22 California Code of Regulations §§63765, and 63770; California Health and Safety Code §§106875, 106885, and §116670.
[35] See California Civil Code section 3479; Code of Civil Procedure section 731.

distribution system of the HCSD as provided by Federal and State laws[36], and the HCSD Bylaws - including the supervision and direction of Dingman.  In spite of these duties, Dixon has consistently failed to actually perform the duties of the "Chief Operator" as set forth in State and Federal laws, and in the HCSD Bylaws at Section A-5-1; failed to maintain and use the "creek diversion" of the HCSD and associated water rights, thus jeopardizing the HCSD's diversion rights with the State; failed to contain the outflow of toxic water from "well #3" into the waterways and particularly the "wild and scenic" Klamath River; acted in conjunction with the HCSD and Board Defendants to attempt to defraud the Federal, State and local governments of employment and other taxes by failing to obtain a Siskiyou County business license, and falsely claiming to be an "independent contractor", when the truth was that the provisions of the Labor Code requires he be classified as a regular hourly employee[37]; and, to conform his conduct at all times to that required by Federal and State law in regards to operation of the HCSD water treatment and distribution facilities[38].  Dixon also thus falsely charged the HCSD for purported services, but did not perform them, almost always being absent from HCSD facilities.

44.  During Dixon's employment with the HCSD, the HCSD, and each property owner, elector, and water customer of the District relied upon Dixon's representation concerning legal operations of the HCSD facilities, that Dixon would be in "direct charge" thereof, and only permit properly certified "shift operators" to work on the water system as required by law.

45.  Dixon has thus billed for, and/or received payment for, services which he did not actually perform.  Finally, Dixon has been provided with legal services by the Board Defendants[39] which are not part of Dixon's contract, and/or which were never authorized by any lawful action of the Board of the HCSD, and are alleged to be waste and gifts of public funds.

---

[36] See Federal Clean Water Act (33 USC §§1251, et seq), and Safe Drinking Water Act (42 USC 300f, et seq); State of California laws implementing same (e.g. Health and Safety Code Sections 116270 et seq, 116375, 116385, and 116395;  California Code of Regulations Title 22, Sections 63765, and 63770).

[37] Indeed, Dixon regularly submitted documents to the HCSD claiming hourly pay.

[38] In failing to operate the HCSD's water system from its main appropriative right (surface) water source, Rancheria Creek, Dixon instead instructed Dingman to improperly and constantly draw the HCSD's water supply from the three HCSD wells (contrary to the instruction of the HCSD's Public Engineer), causing over pumping, degraded and dangerous water quality to the water system that feeds Hornbrook where Plaintiff resides, increasing costs, and potentially damaging the aquifers thereof, all of which threatens the water supply to Plaintiff and the public.

[39] The Board Defendants corruptly and wrongfully conspired, agreed, and acted with each other, and Dixon to wrongfully divert public funds to indemnify Dixon from multiple legal actions, but without any contractual obligation to do so; absent any request to do so per Govt. Code §995; in violation of Water Code §11454(b)(2); and, outside of any lawful, public meeting of the HCSD BOD, and so without any lawful authorization, or other formal action by the Board.

46. At all times relevant herein, Dixon acted in conspiracy with the Board Defendants (and thus the HCSD itself), Dixon, Bowles, and Dingman to create, file with the State Water Board, and distribute, false public records, documents, logs, and reports concerning the operation of the HCSD and its facilities; to operate the HCSD facilities in a manner contrary to law and thus causing a nuisance *per se* to Plaintiff and other members of the public who are served by the HCSD by violating the Clean Water act and various Primary Drinking Water Standards (via allowing Dingman to add excessive Chlorine and otherwise); to prevent and deny access to the public records of the water treatment facility as required by the California Public Records Act; and, to thus deny Plaintiff and other members of the public the rights to petition, equal protection, and due process of the laws relating to the lawful and safe operation of the HCSD.

47. At all times material, Dixon has failed to obey all laws, supervise, and directly control the operations of the HCSD facilities, and the actions of Dingman, and instead, in agreement with, and the ratification of the Board Defendants, Dixon, and Dingman, instructed Dingman to illegally, wrongfully, and improperly[40] assert control over the HCSD systems[41].

48. The refusal and failure by Dixon, the Board Defendants, and Dingman, to comply with the federal and state laws applicable to the HCSD's water production, and to assist and facilitate each other in so doing, created a public and private nuisance *per se*, while the policy, custom, and practice of not requiring the HCSD and its Officers, agents, and employees, to abide by, and/or obey their duty to enforce, State and Federal drinking water laws violated Plaintiff's rights to due process and equal protection of the laws. Plaintiff is therefore entitled to mandate of compliance by the Defendants with the CWA and SDWA.[42]

## XII. DEFENDANT JOHN DOES

49. At all times material, defendant John Does 1-100 were board members, policy makers, employees, independent contractors, instructors, rule enforcers, assistants, co-conspirators, confidants, and otherwise actors and/or agents of the HCSD, the named natural person defendants, the Board Defendants, and/or of each other; executors, recipients of water

---

[40] See California Code of Regulations Title 22, Sections 63770(b)(5), 63770(c)(1)-(2), 63770(d)(1)-(2).
[41] Plaintiff also asserts that wrongful intimidation of Plaintiff, and obstruction by the Board Defendants, and Dingman of access to the facilities and records of the HCSD pursuant to the CPRA implicates the violation of his liberty interests, a "seizure" of an access and property right under the 4th Amendment, due process rights, rights to petition, and equal protection rights, individually, and as a taxpayer within the HCSD boundaries, and that this violation was achieved by the Board Defendants, Dixon, and Dingman without any due process in its execution, and in direct conflict with the HCSD Bylaws for the purpose of chilling and preventing Plaintiff's petitioning rights concerning water operations.
[42] See also California <u>Government Code</u> section 815.6.

services by the HCSD, and/or customers of the HCSD, who were the beneficiaries of improper gifts of public funds in the form of wrongfully and improperly: unassessed, waived, unimposed, reduced, altered, avoided, and/or uncollected due fees, assessments and charges of the HCSD.

50.  The true names and capacities of these John Doe defendants is uncertain at this time, but will be substituted to this Complaint as they are definitely determined and/or discovered.

## XIII.  Civil Conspiracy of the Defendants.[43]

51.  At all times material, the Board Defendants wrongfully, improperly, and/or illegally enlisted the aid of the other Defendants to intentionally promote, accomplish, assist with, legitimize, aid in, and ratify each of the wrongful acts and goals of the Board Defendants (and, Bowles, Dingman, John Does[44], and Dixon) as set forth in the preceding paragraphs, and throughout this Complaint.  Each of these Defendants, with full knowledge of the wrongfulness, and/or unlawfulness of these goals, plans, acts, and methodologies, did in fact agree to, and thereafter acted to, aid, abet, assist in planning and execution, conspire with, and ratify the Board Defendants' wrongful conduct (as well as that of Defendants Bowles, Dingman, and Dixon) as described in the preceding sections.

52.  Plaintiff's allegations of conspiracy, aiding, abetting, ratifying, and/or directly participating in any portion of the conspiracies concerning State laws or common torts detailed in this complaint as to any Defendant also relies upon the general liability as to them by focusing on instances of "substantial assistance" between the Defendants concerning actions undertaken by each, any, and/or all of them in regards to "wrongful conduct"; either their own, or that of other Defendants.  See *Stueve Bros. Farms, LLC v. Berger Kahn* (2013) 222 Cal.App.4th 303.

### FIRST CLAIM FOR RELIEF (Federal Causes of Action)
### Count-I.  VIOLATION OF RIGHT TO FREE SPEECH, ASSEMBLY AND PETITION

55.  Plaintiff alleges that the Board Defendants, HCSD, Bowles, Dixon, and Dingman, in acting as set forth above in manners adverse to Plaintiff, did so willfully, with intent to interfere with, impede, coerce Plaintiff into abandoning, and in retaliation for, his exercise of statutory and constitutional rights to: speak freely; petition the government and courts for redress of grievances; and, his attempts to assert the right to vote on those matters as provided for in the HCSD Bylaws.  In so doing, they violated Plaintiff's First Amendment rights to assemble with

---

[43] This section should be read in conjunction with those describing conduct of each named defendant so as to comply with pleading standards required for conspiracy, and "aiding and abetting" theories of liability.
[44] Those customers receiving wrongful/illegal "deals", waived fees, reduced rates, etc.

the other electors of the District at lawfully-convened meetings; to speak freely; to petition for redress of grievances; and, to be free of retaliation for doing so. Each illegal meeting held by the Board Defendants and/or any of their agents, and each act taken in contravention of the voter control provisions of the HCSD Bylaws, constitutes a violation of, and interference with, those, and Plaintiff's Due Process rights. The Board Defendants, Dixon, Bowles, and Dingman, thus deprived Plaintiff of equal protections of rights and privileges under federal and State law, and the Bylaws, without notice, opportunity to be heard, or chance to vote as required by the Bylaws - all to suppress his protected speech, and to retaliate against him for exercising free speech.

## Count-II.  DEPRIVATIONS OF, DUE PROCESS, AND EQUAL PROTECTION OF THE LAWS; UNLAWFUL SEIZURE

56.  In conspiring and acting as aforesaid to violate State law and the HCSD Bylaws; to censure, retaliate for, and suppress Plaintiff's protected speech (including via his exercise of the right to petition the courts, and his attempts to vote as provided in the Bylaws); and, to retaliate against him for making it by denying Plaintiff his right to vote and due process provisions of the Bylaws to do so, and without any notice or opportunity to be heard concerning those deprivations, the HCSD and Board Defendants, with the agreement, assistance, and ratification of, Bowles and Dingman, also thus violated Plaintiff's right to the due process and equal protection of law[45], and a "seizure" of liberty interests to assertion of his rights.

## Count -III.  CONSPIRACY FOR DEPRIVATION OF RIGHT TO VOTE: (42 USC 1983)

57.  Plaintiff alleges that the Board Defendants and HCSD, during times material to this Complaint, affirmatively agreed and acted several times to thwart Plaintiff's rights to vote by: failing to abide by the requirements of the Brown Act concerning notice to him and the public of meetings, and/or by taking *ultra vires* actions regarding public business of the HCSD triggering a required vote by the electors of the District; and, by failing to abide by the HCSD Bylaws relating to the powers and duties of Plaintiff and the other electors to vote on certain actions, policies, and procedures of the District - instead undertaking such actions and polices in direct contradiction with those provisions without any due process. Further, these same Defendants acted to deny and interfere with Plaintiff's rights as a citizen of the HCSD to vote on various matters as provided by the HCSD Bylaws by forming an agreement, and acting, to wrongfully alter, erase, and/or evade the voting requirements thereof by imposing rate increases, waiving certain fees, charges and classifications, and failing to read meters, among other things.

---

[45] See *Goldberg v. Kelly*, 397 U.S. 254 (1970).

## Count IV:  VIOLATION FO THE CLEAN WATER ACT

58.  The permitting by the HCSD, Board Defendants, Dingman, and Dixon of the HCSD's "well #3", containing high levels of toxic Boron and salts, to flow artesian and unchecked into the waterways feeding the Klamath River at all times material, without a permit to do so by the Environmental Protection Agency ("EPA") violated the Clean Water Act.

## Count V: DEPRIVATION OF RIGHTS TO DUE PROCESS; EQUAL PROTECTION

59.  Plaintiff alleges that the Board Defendants, and HCSD, during times material to this Complaint, failed to act on, or respond in any way to Plaintiff's multiple requests pursuant ot the CPRA for access to records; for consideration and indemnification of his job-related medical expenses; for statutorily-mandated opportunity to vote on items of the HCSD relating to its ongoing operations, and as mandated by the HCSD Bylaws; and that the denial of these rights by the HCSD, and Board Defendants, while wrongfully allowing themselves full control over them without any notice or hearing to Plaintiff or the other electors of the District, deprived Plaintiff of his right to due process and equal protection of the laws insofar as other persons in other political subdivisions of the State are not subject to having their rights to full and fair due process of these laws, and to vote, usurped and/or denied, particularly absent notice and opportunity to be heard.

## Count – VI: DEPRIVATIONS OF RIGHTS TO THE EQUAL PROTECTION OF THE LAWS, AND TO DUE PROCESS OF LAW

60.  The HCSD, Board Defendants, Dixon, and Dingman, did improperly and illegally conspire to, and actually did, wrongfully violate, and refuse to follow, the mandate of: the SDWA and CWA; State laws relating to drinking water facilities and operation thereof (including, but not limited to, the Health and Safety Code); and, the HCSD Bylaws, with the assistance, affirmation, and ratification of Defendants Bowles.  These Defendants did so in part by allowing Dingman to operate the water treatment and distribution facilities of the HCSD without State-required certifications; permitting Dingman (and his dog) to illegally and improperly[46] occupy the water treatment plant of the HCSD and to use the electricity thereof for his personal use, without any compensation; acted with the aid, assistance and ratification of Dingman and Bowles, in also acting to wrongfully, improperly and illegally alter the rates and fees of the HCSD; wrongfully failed to charge each commercial (of both tiers), governmental, and/or residential customers the proper rates, fees, and/or charges associated with each particular account; while further failing to comply with Water Code sections 31007 and 71616, to benefit

---

[46] See California Code of Regulations Title 22, Sections 63770(b)(5), 63770(c)(1)-(2), 63770(d)(1)-(2).

their friends and associates outside of public meetings, without voter approval, all in contradiction of the Bylaws and applicable State and Federal laws.  These same Defendants also failed to require that Dingman keep any proper logs or other data concerning operation of the HCSD water production facilities as required by law and administrative rules - all while denying access to public records during normal business hours, and in contravention of the procedures and requirements of the HCSD Bylaws, and the CPRA.

## Count – VII: DEPRIVATIONS OF RIGHTS TO EQUAL PROTECTION OF THE LAWS, TO DUE PROCESS OF LAW; AND RIGHT TO VOTE

61.  The Board Defendants and Bowles, by improperly and wrongfully altering, waiving, reclassifying, and/or failing to collect rates and fees of the HCSD to benefit their friends without voter approval[47]; permitting operation of HCSD water production, treatment, and/or distribution facilities by Dingman as an uncertified operator in violation of the Safe Drinking Water Act and Clean Water Act; failing to charge each commercial, governmental, and/or residential customer proper rates, fees, taxes, and/or charges; treating Plaintiff differently than other District residents and electors concerning notices and informational inserts as well as his requests to hook up to the HCSD water distribution system; not complying with <u>Water Code</u> sections 31007 and 71616; all in contradiction of the Bylaws and State laws, also deprived Plaintiff of the equal protection of the laws, and Plaintiff's right to the due process of law insofar as he, as an elector of the District, was denied the right and opportunity to vote **on each and every** of those fee and/or tax reductions/waivers/changes, and without due process of law regarding deprivation of those rights

## Count VIII: Unlawful Retaliation for Exercise of Constitutional Rights

62.  Plaintiff's requests for indemnification for medical costs of his work-related injuries, complaints, assistance to others making complaints, and testimony to the HCSD, courts, and State and Federal enforcement agencies of violations of the SDWA, CWA, and wrongful suppression of Plaintiff and the public's right to vote by the HCSD, Board Defendants, Dingman, and Dixon, entitle him to protection from retaliation from them, including by denial of: any services, right to vote, statutory rights, or discriminatory refusal to provide any due process concerning his requests for worker's compensation indemnification.

63.  The HCSD, by and with the Board Defendants, undertook the wrongful acts herein in part to retaliate against Plaintiff for his exercise of First Amendment rights by wrongfully using

---

[47] See Bylaws at Sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, 1-5.030.

their official positions to eliminate Plaintiff's ability to assemble, petition[48], and speak at public meetings, and to vote - all as provided by law, and without any due process of law.

64.  These Defendants acted to deny Plaintiff proper, timely, statutorily-required notice or opportunity to assemble, attend, and be heard concerning all HCSD meetings and business and his statutory rights under their dominion/control; to inspect public records (including documents associated with matters considered at public meetings of the Board); and, his right to vote on those matters as specified in the Bylaws, with the aid, ratification, and agreement of Dingman and Bowles.

65.  As a result of these failures, Plaintiff's rights to the equal protection of the laws, and the due process of the laws, as well as his rights to indemnification for his work-related medical expenses, to speak and petition the government for redress, to assemble with his fellow electors, and to vote as to those matters controlled by the voters in the HCSD Bylaws, were infringed, chilled, denied, and/or violated.  On information and belief, Plaintiff alleges that some John Doe Defendants improperly directed, agreed to, encouraged, assisted, aided, and abetted the Board Defendants in committing that wrongful conduct, and as herein alleged[49], ratified their conduct (primarily by assisting to conceal it) when such conduct was undertaken, and/or wrongfully and/or corruptly benefited from that wrongful and/or illegal conduct.

## Count XI - DEPRIVATIONS OF RIGHT TO DUE PROCESS, AND EQUAL PROTECTION OF THE LAWS - Illegal Modification/Ignoring of the HCSD Bylaws

66.  At all times material, the Board Defendants, wrongfully, in violation of State law and HCSD Bylaws, acted to ignore provisions of, and countermand, the Bylaws of the HCSD, without notice or due process, and absent any vote of the electors of the District as required.

67.  By so doing, and particularly in secret prior to, and then later at, various improperly-held meetings in furtherance of the conspiracy to wrongfully divest the Public, and Plaintiff, of rights under the Bylaws[50], these Defendants acted to deprive Plaintiff of his rights to the equal

---

[48] In addition to the petitioning activity directed to various governmental agencies and the courts, this claim would also apply to Plaintiff's repeated attempts directed at having the HCSD and Board Defendants address his worker's compensation indemnification claims, and to connect to water service.
[49] By a "series" or "daisy-chain" arrangement conducted via telephone, emails, intermediaries, letters, personal meetings with individuals or groups of the HCSD BOD (outside lawful public meetings), and by creating - without any legal authority - various documents for the Board Defendants to use, purportedly in their official capacity (and to be represented as having been created by one or more of the Board Defendants themselves).  Plaintiff and the public were wrongfully excluded from these secret meetings.
[50] The Bylaws are separately lodged.  One of the main provisions therein, set forth in multiple places, is the requirement of voter approval to make changes to specific sections and/or provisions of the Bylaws,

1  protection of the laws prohibiting such conduct, and due process of law, and to vote on such

2  issues as set forth in the Bylaws.  The acts by these Defendants were arbitrary, irrational,

3  capricious, undertaken by them for an improper purpose, and were *ultra vires* and void.

### Count XII: Violation of Fourth Amendment

4      68.  Plaintiff asserts that: holding secret, or non-agendized meetings/items, and/or

5  wrongfully "closed session" portions of meetings, in violation of the Brown Act; denial of access

6  to facilities and public records of the HCSD pursuant to the CPRA by simply ignoring requests

7  made thereunder; failing to schedule any Board consideration and/or action, constitutes wrongful

8  infringement/seizure upon the Legislatively-granted liberty interests of Plaintiff, and obstruction

   of statutory rights without due process by the Board Defendants, HCSD, Dingman, and Dixon.

9

### ***SECOND CLAIM FOR RELIEF - PENDENT STATE CLAIMS***

10     69.  If Plaintiff states a claim or cause of action that only permits injunctive or other

11  relief, but inadvertently asserted a claim for damages, Plaintiff reserves his right to non-monetary

12  relief as otherwise provided by law, and Government Code section 814.

### Count – I, Violations of HCSD Bylaws

13     70.  Plaintiff, per Section A-9(26) of the HCSD Bylaws, alleges that the Board

14  Defendants, HCSD, Bowles, Dingman, and Dixon, in engaging in the conduct alleged herein, did

15  also thus wrongfully, improperly, and illegally, conspire to, and actually did, violate or refuse to

16  follow the mandate of, multiple provisions of the HCSD Bylaws by: denying Plaintiff access to

17  HCSD facilities, and records; engaging in acts that can only be done by voter approval, while

    denying Plaintiff and other electors the right to vote as to those acts; improperly waiving all sorts

18  of fees, penalties, and charges for certain customers; failing to collect on and/or shut off service

19  to overdue accounts; failing to properly levy the rates set for businesses, commercially-zoned

20  properties, and multiple dwelling customers; making wrongful purported Bylaws changes in

21  ways prohibited thereby; failing to assess and collect the "standby" and/or "availability" fees of

22  the HCSD; and, failing to require landlords to put water service for delinquent rentals into their

23  name. These Defendants thus also failed to provide, impose, and collect rates, taxes, fees, and

24  charges sufficient to fund the operations, upkeep, and repairs to the District infrastructure and

    facilities mandated by the Water Code at §§ 31007, 61100, 71616.

25

and also that any resident or property owner within the District has an array of petitioning rights and legal recourse concerning improper acts by the HCSD Board, its employees, etc.  The primary goal of the Board Defendants in this instance was to eviscerate the efficacy of those provisions, or to prevent their exercise by Plaintiff or other electors.

73. The Board Defendants, Bowles, Dingman, and Dixon, failed to comply with the HCSD Bylaws, at Sections A-1(4); A-1(6); A-1(7); A-1(10); A-2(3); A-2(10); A-2(11); A-3.3; A-3(7-8); A-4(3); A-5-1; A-7; A-9(1); A-9(3); A-9(13); A-9(14); "MEETINGS" at p.15, #1; Sections 1-2.020; 1-2.090; 1-2.100; 1-3.010; 1-4.010; 1-4.040, 1.5010(a), 1-5.020, 1-5.030.

## Count II - Negligence

74. In performing the acts complained of herein in the section(s) devoted to each particular Defendant, and in the "general" paragraphs, each and all of the Defendants acted negligently, recklessly, and with wanton indifference and disregard for any possible harm that may have befallen the HCSD, the Public, and/or Plaintiff as a result of their failures to abide by the Constitution and laws of the United States, the State of California, and the Bylaws of the HCSD. (See also, generally, California Civil Code, section 1714.)

## Count III - Gifts of Public Funds; False Claims, and Fraud as to Clint Dingman

75. At all times material to this Complaint, Defendant Clint Dingman improperly conspired with, influenced, and engaged in corrupt activity with the Board Defendants and Bowles in order to receive gifts of public funds, in the form an unagendized, and unformalized[51], "pay increase", and for extra hours to be paid in excess of his contract (regardless of actual hours worked), agreeing to a set rate of pay and cap of 35 monthly hours (all such excess rate, and hours thus being a gift of public funds[52]).

76. Since the wrongful increase in pay and hours, Dingman has also fraudulently claimed to have performed all of the duties applicable to his position(s) within the HCSD, and to have worked various hours every two weeks on those tasks, when in fact he did not faithfully actually complete those tasks, and/or work those hours as he claimed on his time records - instead falsely inflating the times he alleged it took to complete the same tasks gradually over time. Dingman further failed to use the log in/out sheet at the water plant, or permit any supervision of his time working at any HCSD facility in order to conceal these facts and falsehoods. All of these acts were undertaken by Dingman in order to wrongfully collect money to which he was not entitled. The Board Defendants, Dingman, Dixon, and Bowles further conspired, and acted, to wrongfully and deliberately conceal from the Public, and Plaintiff, the wrongfully inflated pay and hours, and the false claims of work performed. Further, Dingman performed operations at the water

---

[51] That is, the Board of the HCSD never ratified or approved any such changes to Dingman's contract at a public meeting, and/or in conformance with Govt. Code 61045 and/or the HCSD Bylaws.
[52] Cal. Const. Art. XVI, Section 6; Cal. Const. Art. IV, Sec. 17; Cal. Govt. Code section 8314.

plant (addition of chlorine and other chemicals), for which his was not licensed and/or certified, in violation of State law, with the ratification, encouragement, agreement, and assistance of the Board Defendants, Bowles, and Dixon, and so was not entitled to be paid for those illegal acts.

77.   Plaintiff invokes herein the strictures and remedies of California Code of Civil Procedure Sections 526a, 1021.5, and 1084.

### Count V - Gifts of Public Funds to Julie Bowles

78.   Defendant Julie Bowles improperly conspired with, influenced, and engaged in corrupt activity with, the Board Defendants herein, in order to receive wrongful gifts of public funds during the times material to this Complaint, in the form of indemnification and/or legal defense not requested by, nor mandated by any contract Bowles had with the HCSD.

79.   Such excess pay and benefits granted by the Board Defendants, particularly absent any request and hearing at a public meeting concerning indemnification, constitute a gift of public funds to Bowles.  Plaintiff invokes herein California Code of Civil Procedure §§526a, 1021.5, and 1084; Cal. Const. Art. XVI, §6;  Cal. Const. Art. IV, §17, and Govt Code § 8314.

### Count VI - Wrongful Diversion of, and Gifts of, Public Funds to Michele Hanson

80.   During the period material to this complaint, the Board Defendants agreed, conspired, and acted to wrongfully divert public monies from the HCSD accounts to payment of the private legal fees of Michele Hanson in Siskiyou County Superior Court Case #SCCVHA 15-0205.  Hanson never requested indemnification for that matter, nor was that indemnification agendized, discussed, or approved by the Board, and those payments are and unlawful gift, and waste, of public funds.  Plaintiff invokes the remedies of Code of Civil Procedure §§526a, 1021.5, and 1084; Cal. Const. Art. XVI, §6;  Cal. Const. Art. IV, §17, and Govt Code § 8314.

### Count VII - Gifts, and Waste of, Public Funds as to John Does

81.   John Does who had their water rates, fees, assessments, and/or other charges duly payable to the HCSD wrongfully and improperly reduced, reclassified, and/or waived (or not imposed at all); property not liened when they had a large and long-term outstanding balance(s) with the HCSD; whose accounts were never collected on as to those and/or any past due amounts; and/or, who were otherwise gifted with public funds by any action of the HCSD, Board Defendants, Dingman, and/or Bowles for the times relevant to this complaint, in violation of California Code of Civil Procedure Sections 526a, 1021.5, and 1084; Cal. Const. Art. XVI, Section 6, and Government Code section 8314 are liable for repayment, along with the Board Defendants (per the HCSD Bylaws), of all such wrongfully waived monies.

## Count VIII - Violation of Article 1, section 3, of the California Constitution

82.  The Board Defendants and Dixon, with the aid, assistance, and encouragement of Bowles, and Dingman, during the times material to this Complaint, agreed, conspired, and acted to wrongfully conceal from the public, and from Plaintiff, numerous public records, have refused to provide access to, and copies of, public records upon demand as required by the CPRA and other laws, and acted to falsify other public records, in furtherance of the wrongful conduct undertaken by them individually and/or jointly as described *ante*, all in violation of Article 1, section 3, of the California Constitution, and the California Public Records Act.

83.  As a consequence of these Defendants' acts, Plaintiff has been caused to suffer violation of his rights, as well as wrongful, arbitrary, capricious, undue and unfair denial and termination of his State statutory and Constitutional rights without any due process.

## Count IX - Unfair Business Practices as to Julie Bowles

84.  Defendant Bowles, in performing the acts as complained of herein, have during the times material to this Complaint, under the assumed mantle of employee and/or agent of the HCSD, while violating, and conspiring to violate, the various Constitutional provisions, Acts, laws, statutes, regulations, codes, and/or the HCSD Bylaws as set forth herein, also thus violated California's unfair business practices legislation, found at California Business and Professions Code 17200, et seq.

## Count X - Nuisance, by HCSD, Board Defendants, Dingman, and Dixon.

85.  The HCSD, Board Defendants, Dingman, and Dixon acted negligently, recklessly, wantonly, and/or willfully to violate the Safe Drinking Water Act, the California Health and Safety Code, and the HCSD Bylaws, in their flawed administration of the HCSD, and operation of the HCSD water production, treatment, and/or distribution facilities, thereby created, assisted in creating, and/or ratified the acts of each other in creating, annoying and/or unsafe conditions relating to distribution of water to the public and to Plaintiff, and which wrongly-produced water was offensive to the senses, and physically dangerous to persons and property.

## Count XI - Failure to Impose Standby Fee - Collect Due Fees and Taxes.

86.  The acts of the HCSD, Board Defendants, and Bowles, in failing to impose, levy, and collect the "standby" and/or "availability" fees as provided by law, and mandated by the HCSD Bylaws as modified in 1996, and incorporated into the Bylaws adopted on April 18, 2014, as to the eligible parcels in the District during the times material to this Complaint, was a violation of the HCSD Bylaws, and breached the fiduciary duty of these Defendants to the District and the Public, constituting an injury to the fiscal health of the HCSD, and a waste of public funds as

contemplated by Code of Civil Procedure section 526a, and recoverable per the HCSD Bylaws.

### Count XII - Unfair Business Practices as to Kevin Dixon

87. Plaintiff alleges that the individual Board Defendants, and Dixon, in performing the acts as complained of herein *ante*, under the assumed mantle of employees and/or agents of the HCSD, in violating, agreeing, and conspiring to violate, the various Constitutional provisions, Acts, laws, statutes, regulations, codes, and/or the HCSD Bylaws as set forth herein, and by virtue of Dixon's failure to at any time possess a valid Siskiyou County business license while working for the HCSD, thus violating California's unfair business practices legislation, found at California Business and Professions Code 17200, et seq.

### Count XIII - Negligence as to HCSD, Board Defendants, Dingman, and Dixon

88. Plaintiff alleges that the individual Board Defendants, Dingman, and Dixon, each owed a duty to Plaintiff to reasonably conform their conduct to the laws of the United States, the State of California, and the HCSD Bylaws, but in performing the acts as complained of *ante*, and against Plaintiff under the assumed mantle of employees and/or agents of the HCSD, breached that duty in recklessly and negligently violating the various Constitutional provisions, Acts, laws, statutes, regulations, codes, and/or the HCSD Bylaws as set forth herein. As a result of their acts, Plaintiff suffered harm, loss, and damages.

### Count XIV - CPRA Violations; HCSD, Board Defendants, Dixon.

89. The acts of the Board Defendants, Dixon, and HCSD, in corruptly conspiring to, acting to, and actually accomplishing, the failure to timely, properly, and/or completely respond to Plaintiff's California Public Records Act requests, at all times material, in the manner, and as provided by law, have also violated California's California Public Records Act. Plaintiff seeks declaratory and injunctive relief compelling the production of the records requested.

### Count XV – Willful and/or Negligent Infliction of Emotional Distress

90. Plaintiff alleges that the Board Defendants, in refusing to grant his requests for review of his valid worker's compensation claims, and in performing the other acts complained of herein as to any particular one of them, or identified group of them, did so while acting negligently, recklessly, wantonly, and/or willfully to vex, harass, oppress, and annoy Plaintiff, and/or to subject him to lasting fear, anger, upset, anxiety, public humiliation, embarrassment, outrage, ruination of credit, denial of credit, financial loss, and extreme ongoing emotional and psychological pain and distress, all the while acting with wanton indifference and reckless disregard for any possible harm that may have befallen Plaintiff as a result.

### Count XVI Purported Official Acts of the Board Defendants Are Void

91. The acts of the Board Defendants, and as purporting to act as the HCSD, as well as all actions taken by Defendants Dingman, and/or Dixon, done in reliance upon any (wrongful and/or illegal) purported act, instruction, direction, or act of the Board Defendants and/or the HCSD as set forth *ante*, are each null and void due to being *ultra vires*, due to criminality[53], due to being a nuisance *per se*[54], due to Brown Act violations[55], due to being in violation of provisions of Bylaws of the HCSD and related Resolutions.

### Count XVII Improperly Unbilled Fees and Charges - Gifts of Public Funds

92. The Board Defendants, with the assistance, aiding and abetting, and ratification of Defendants Dingman and Bowles, have wrongfully conspired and acted to (and without the voter approval required by the HCSD Bylaws): improperly bill, fail to bill, fail to impose, and fail to collect, all due and payable fees for water service and other charges as set forth in the HCSD Bylaws and Resolutions from residential, multi-dwelling, commercial, and governmental accounts of the HCSD; have, in order to financially benefit themselves, their political allies, and their associates, failed to regularly, consistently, timely, and properly read the meters of the customers of the HCSD so that proper and accurate charges and fees may be imposed; and in so doing, they have injured the property and economic viability of the District, and caused injury to, and/or waste of, its financial resources, and/or are an impermissible gift of public funds. Plaintiff invokes Code of Civil Procedure §526a, and the HCSD Bylaws[56] provisions imposing liability, and to require the collection of any unbilled, waived, reduced, and/or non-imposed fees/charges.

### Count XVIII Waste of Public Funds by the Board Defendants and/or the HCSD

93. Each act of wrongful, illegal, improper, or unethical conduct by the Board Defendants, and/or the HCSD set forth herein, as well as any and all conduct in violation of the HCSD Bylaws, constituted a waste, and illegal expenditure of, taxpayer funds pursuant to the provisions of California Code of Civil Procedure 526a. Plaintiff is entitled to an injunction as to all such actions by the HCSD and/or Board Defendants to prevent the continuation of illegal policies and practices as set forth in this Complaint, and the concurrent waste of taxpayer funds.

---

[53] See Govt. Code Sections 54959, 61064(a), 91003(b); Civil Code Section 3369.
[54] Both due to being violations of the HCSD Bylaws, and/or federal. and/or State law. See also Civil Code Section 3479-80, 3491; *In re Firearm Cases* (2005) 126 Cal.App.4th 959, 988-89; *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920. The HCSD Bylaws also provide at Section A-9(26) that any violations thereof are a nuisance per se, and authorizes suit for injunctive or other relief for violations.
[55] See Govt Code Sections 54953(a) and (c); 54960.1(d).
[56] Including, but not limited to, Section A-9(26).

## Count XIX  Violations of the CPRA - Remedy

94.  The refusal of the HCSD and Board Defendants to comply with the provisions of the CPRA in response to Plaintiff's repeated requests for records thereunder is a violation on each occasion of that statutory scheme, and of the California Constitution at Article 1, Section 3(b). Petitioner seeks a writ of mandate from the Court compelling the HCSD and Board Defendants to immediately produce all of the requested records without any objection or offset, as no response was made to his requests as required by law.  See California Government Code §6259.

## Count XX  Violations of the CPRA as a Waste of Public Funds

95.  At all times material, the Board Defendants, Dingman, Dixon, and HCSD had, and operated under, policies, customs, and practices of willfully and wrongfully violating the California Public Records Act (CPRA) by: withholding agency and public records from Plaintiff and the public to conceal improper, illegal, and/or wrongful actions of the Board Defendants, Dingman, Bowles, and/or Dixon; failing to respond as required by law and due process to CPRA requests made by Plaintiff; to permit access to or to produce for inspection public records requested by Plaintiff; failing to maintain a place open to the public during normal office hours for inspection of public records of the HCSD; and, wrongfully and improperly resisting lawful public records requests by Plaintiff, and the Public for, and by, by other improper means.

96.  Acts in violation of the CPRA by these Defendants are a waste of public funds, wrongful and illegal as set forth, and so relief is requested (in addition to any other available relief) to enjoin and nullify these policies, customs, practices, and related acts of these Defendants, pursuant Code of Civil Procedure section 526a, and instructing these Defendants to refrain from expending public funds to promulgate, enforce, operate under, and/or have any agent of the HCSD intercede concerning, all policies, customs, and practices which violate the CPRA.  See *County of Santa Clara v. Superior Court (Naymark)* (2009)171 Cal.App.4th 119.

## Count XXI  Violation Public Contracts Code, Uniform Construction Costs Accounting Act

97.  The HCSD, Board Defendants adopted, but then agreed and acted to violate, the Public Contracts Code, and Uniform Construction Costs Accounting Act by: failing to develop and/or promulgate: scopes of work for jobs and employment positions with the HCSD; failing to create a "Qualified Contractors" lists of available and interested contractors/service providers; blackballing disfavored contractors from jobs - including Plaintiff; failing to create methods for applications by contractors and responsible bidders for consideration of proposals and bids; and, refusing to give public notification of public works jobs - and refusing to provide such information when requested by licensed contractors, including Plaintiff.

**Count XXI  Wrongful Diversion of Water Fees to Non-Production Expenses**

98.  Water fees and charges from the customers of the HCSD are required by law to be used for maintenance, repair, and necessary upgrades to the water system in order to provide for the health and safety of the District's customers.  Rather than doing so, the HCSD and Board Defendants wrongfully agreed and acted to divert some funds to their program of harassment of Plaintiff and others via the hiring of private lawyers, and, in the case of actions in which the HCSD and/or Board were defendants, rather than submitting such work to either the County Counsel's office, or to their insurance company, to receive free representation.  The HCSD, Board Defendants, Dixon, and Bowles also did so by wrongfully diverting public funds to the defense and indemnification of Bowles and/or Dixon absent requests to do so via Government Code §995, absent provision in contract, and/or in violation of Water Code §11454(b)(2)

**The Actions of These Defendants Resulted in Damages to Plaintiff**

98.  Plaintiff alleges that the actions by the specified Defendants as set forth in each of the foregoing "counts" of his First and Second Claims for Relief, and as incorporating the factual allegations against each Defendant as specified in their respective Sections, caused general, special, and pecuniary damages to Plaintiff, in an amount to be proven at trial, but in no event less than $50,000.00 per event, circumstance, alleged tort, or statutory violation.

**Punitive Damages Demand**

99.  Plaintiff alleges that the actions of each of the Defendants herein, as described in this Complaint in each of the foregoing "counts" of his First and Second Claims for Relief pertaining to any of them, and incorporating the factual allegations against each Defendant as specified in the foregoing Complaint, were reckless, willful, wanton, and oppressive, and done with willful disregard for Plaintiff's rights, or any harm that may have befallen Plaintiff or his interests, and so Plaintiff seeks, and hereby demands, punitive and exemplary damages as to each and all of these Defendants in the amount of $100,000.00 for each such occurrence as is set forth.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff now prays for judgment against Defendants, as well as:

1.  Declaration of the respective rights and duties of the parties as to the acts of these Defendants as alleged herein and at the times material to the Complaint;

2.  For general, special, economic, and exemplary damages as determined at trial, but in the minimum amount of $250,000.00;

3.  Disgorgement of all wrongful diversions and/or gifts of public funds received by Bowles, Dingman, Dixon[57], Hanson, John Does and any other entity, agency, or individual, inclusive of: special perks; uncontracted indemnifications; or, water charges, assessments, and/or fees of any sort wrongfully uncharged, reduced, or waived in violation of the HCSD Bylaws by Dingman, Bowles, the HCSD, and/or the Board Defendants herein;

4.  An Order commanding the HCSD and the Board Defendants to within 30 days identify any individual, entity, or agency that had water charges and/or fees of any sort reduced or waived in violation of the HCSD Bylaws, Water Code section 31007, Cal. Const. Art. 16, Sec. 6, or any other regulation or statute, and to recoup those fees and charges within 120 days;

5.  Restitution by the Board Defendants for losses incurred to the HCSD occasioned by gifts of public funds arising from their wrongful acts as provided by the HCSD Bylaws;

6.  An Order commanding the HCSD to immediately cease diverting funds collected for water service away from the construction and maintenance of water infrastructure;

7.  An Order commanding the HCSD to maintain only operators certified by the State of California in the capacities of Operator(s) of the HCSD water systems;

8.  A declaration that operation of water facilities of the HCSD by Dingman, an uncertified operator, was, at all times material, a nuisance *per se*, illegal, in violation of Health and Safety Code §§106876, 106878, 106885, and/or 116670, and that those sections, as amended by the Legislature, overrule any contrary administrative rules or exceptions by any agency;

9.  For a preliminary injunction and a permanent injunction, each enjoining Clint Dingman from using the HCSD water treatment facility as a residence, or for personal storage;

10.  For preliminary and permanent injunctions, each enjoining the HCSD from allowing overflow of Chlorinated water from "Tank 2", and the unstored flow of water from Well #3;

11.  An Order declaring each purported act, agreement, contract, and/or action of the Board Defendants, and the HCSD, taken in violation of: the Brown Act; the CPRA; the HCSD Bylaws; Government Code §1090; and/or, any other State law at any time material herein, to be *ultra vires,* and/or void for illegality[58];

---

[57] As to Dixon, Dingman, Hanson, and Bowles, this includes the cost of their purported indemnification by the HCSD and Board Defendants in certain legal matters, insofar as such legal expense was not specified in their contracts, and/or such indemnification and defense was never requested by those persons, and/or determined by the Board to be appropriate per Govt. Code §§995, and 61045.

[58] California Civil Code §1608 codifies the doctrine of illegality and provides that "[i]f any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Under Civil Code §1667 , "unlawful" is broadly defined as that which is

12. For a preliminary injunction and a permanent injunction, each enjoining the Board Defendants, individually and/or in concert, from undertaking the duties and powers of a General Manager as defined in <u>Government Code</u> §§61050 and 61051, and/or the HCSD Bylaws;

13. A declaration that all acts, resolutions, and actions By the HCSD or Board Defendants, pertaining to any issues for which the electors of the District have been granted voter control in the HCSD Bylaws at sections A-9(1); A-9(11); A-9(13); A-9(26); 1-3.010; 1.5010(a), 1-5.020, and/or 1-5.030, but done without voter approval, to be null and void;

14. An Order commanding the HCSD to immediately comply with all provisions of the Public Contracts Code, and Uniform Construction Costs Accounting Act, to publish all contemplated public projects as a proper scope of work, and to specifically create a means by which interested contractors may obtain information on those projects, and on the submission of bids (including all standards therefore) - as well as a means by which contractors may be placed upon "the list" of availability for work within the District;

15. For any attorney fees and costs of suit herein actually incurred; and,

16. For such other and further relief as the court may deem proper.

Dated this ___ day of January, 2021

Roger Gifford, Plaintiff Pro Se

---

contrary to an express provision of law; contrary to the policy of express law, though not expressly prohibited; or, otherwise contrary to good morals. The Brown Act provides as a remedy that improper acts be voided by the Courts upon proper application, as done in this action.

Roger Gifford, In Pro Per
15226 Hornbrook Rd.
Hornbrook, CA 96044
530-340-1395, gunsnhorses@yahoo.com

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

Roger Gifford,                          )    Case No:
                                        )
            Plaintiff,                  )    LODGED DOCUMENTS
                                        )
    vs.                                 )    Hornbrook Community Services District
                                        )    Bylaws, as adopted April 18, 2014
Michele Hanson, et al,                  )
            Defendants,                 )
_____     )

Plaintiff Roger Gifford does hereby lodge as Exhibit A, a true copy of:

## "THE HORNBROOK COMMUNITY SERVICES DISTRICT

## COUNTY OF SISKIYOU, STATE OF CALIFORNIA

### An Independent Special District Formed March 15, 1978

### BYLAWS - Consisting of Twenty-Nine Pages"

The Bylaws of the Hornbrook Community Services District ("HCSD") are referenced

extensively in Plaintiff's complaint, and should be referenced by the parties and Court during the

proceedings in this case.

Plaintiff Roger Gifford does hereby also lodge, as Exhibit B, a true copy of HCSD

Resolution #14-023, which demonstrates the findings of the HCSD Board dealing with the

Bylaws.

Respectfully submitted this 19th day of January, 2021.

_____
Roger Gifford, Plaintiff Pro Se

Notice of lodging of Documents; HCSD Bylaws and Reso. #14-023 - 1

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

THE HORNBROOK COMMUNITY SERVICES DISTRICT
COUNTY OF SISKIYOU, STATE OF CALIFORNIA
An Independent Special District Formed March 15, 1978
BYLAWS - Consisting of Twenty-Nine Pages
**Title A**

### Section A-1, GENERAL PROVISIONS

1. The District will furnish a system, plant and works used for public and private uses, including all parts of the enterprise, and lands, easements, rights inland, water rights, contract rights, and other water supply, treatment, storage and distribution facilities and equipment. The District shall adopt as its top priority the creation of additional water generation and storage facilities, as well as the expansion of existing water and storage facilities. Alternative energy sources (solar, wind, etc) used to generate and store water shall be obtained and installed as soon as possible.

2. "District" means the Hornbrook Community Services District ("HCSD"), an independent special district organized under the laws of the State of California for the purpose of providing safe, potable water to the community of Hornbrook, along with all the members of the Board of Directors ("Board" hereinafter), together with the Systems Operator, General Manager and District Bookkeeper/Clerk/Treasurer, and any other duly authorized employees and/or representatives.

3. Facilities within the District shall keep a log of each day's access and activities by any persons, including Board members and employees. The log shall note the name of each person accessing the facility, as well as the date and time of access of the facility.

4. Permanent records shall be kept of the plans, works, operations, and functions of the District, as well as the ordinances, resolutions, authorizations, and other legal actions of the Board of Directors. An audio, and/or an audio/video record will be made of each meeting of the Board, including closed meetings, and the records of such meetings shall be preserved on digital media for a period of at least three years, and thereafter may only be destroyed as provided by law. Any audio or video device used by the Board to record meetings shall be compatible with common computer hardware and software to allow for transfer and storage of the record. Copies of all records and recordings shall be provided to the County Counsel by the President of the Board of Directors, or the president's designee, as needed to memorialize important District actions, and to the Public upon request, excepting those matters exempt by law from public disclosure.

5. The District shall comply with the most modern standards and practices relating to records restoration, retention, accounting practices, billing, and provision of services.

6. All official acts of the Board of Directors shall be documented, and documents pertaining thereto shall be signed by the Secretary of the Board, or they are void. In the event there is no Secretary, a sitting Board member may sign in that worthy's stead, with a notation on the document.

7. The Board shall develop a one year, five year, and ten year plan for expansion and renovation of all water facilities, systems, distribution network, and services.

8. Any previous bylaws, and/or any prior resolutions, or ordinances, to the extent they may be, or considered to be, inconsistent with these Bylaws, are hereby rescinded and revoked, and the Bylaws as set forth herein shall supersede them. No previous bylaws or resolutions that form the basis for any provision of these Bylaws is intended to be, nor is, rescinded or revoked by adoption of these bylaws to the extent necessary to fulfill the purpose, duty, or power(s) conferred herein.

9. All billing records, and all other records not specifically containing private medical information, or social security numbers, or other private information of employees are hereby affirmed as public records. Any and all records of the District shall be provided for inspection upon public request, and copies thereof made upon payment of reasonable copying and mailing fees.

1

Documents containing confidential or privileged information shall be redacted of that information, and the balance of the document provided.

10. Of each month's net receipts (if any), at least 25% shall be deposited into the Capital Improvement Fund, and at least another 25% into the Reserves Fund, leaving 50% to go into the General Fund.

## Section A-2, POWERS AND DUTIES OF THE BOARD

1. The Board of Directors may exercise all of the powers conferred upon it by the Community Services District Law, and all other applicable state law. The Board may also decline to exercise powers granted to it under State law. The Board may adopt such rules and regulations not inconsistent with law as may be necessary for the exercise of the powers conferred and the performance of duties imposed upon the Board. Members of the Board shall comply with the ethics training provisions of California Government Code Section 53234, et seq., but may do so at the convenience of Board members, and by any means available.

2. The Board of Directors of the district shall have the same rights, powers, duties and responsibilities with respect to the formation and government of improvements within the district, but also as set forth in California Water Code Section 31007.

3. Assessments, stand-by fees, and/or liens in the district, shall be levied, collected and enforced at the same time as annual property taxes for purposes of improvements within the district, and to the extent possible, through the Siskiyou County Assessor's office via property tax bills.

4. The Board of Directors shall hold an annual meeting at the first regular meeting in December to reorganize the positions of the President, Vice President and Secretary of the Board. Three out of five Board members must agree on all changes of the positions, or a simple majority of the remaining members if not all Board positions are held at the time of the meeting. Changes in positions are not mandated, and all positions may be held for consecutive terms.

5. The Board will create and ratify an annual budget with facts and figures submitted by the Systems Operator, General Manager, and District Bookkeeper/Clerk/Treasurer. Audits shall be performed as required by law, and all expenses shall be documented and all receipts (or copies) retained.

6. The Board has a duty to do everything possible to maintain, upgrade, and expand the water supply and facilities within the District. This duty specifically includes actively seeking any and all possible grants, loans, or other funding, and in aggressively collecting all fees. In the event no Board member has expertise in applying for, or obtaining such funding, a professional grant writer shall be retained as necessary to obtain any available grants, loans, and/or other funding.

7. No family member of a sitting Board member may be paid as a hired employee of the District, or to provide a service to the District, unless the position or service for which the family member is applying has been open to applications for at least 30 days, disseminated by internet posting, electronic billboard, or newspaper within the County of Siskiyou and/or Jackson County, Oregon, or posted for that period of time with the State of California Employment Development Department, and no competing and considered applications have been made for the position, or bids submitted to provide the service - in which case the decision to hire the individual, or to have them provide the service shall be made on the merits of all applicants. In any event, the Board member(s) who are related to the applicant or provider shall not vote on his appointment to a paid position, or any other questions concerning his pay or employment. It shall be the policy of the HCSD to have a merit system regarding all employment positions within the District, and to hire the least expensive, but most qualified, employees and services as needed.

8. All services and equipment provided to the district shall be obtained or purchased as the result of competitive pricing and/or bidding as may be appropriate. A list of the material needs of the District shall be made available to all Board members and the to the public. Any Board member, or member of the public, who is able to find a "low price" for any particular item or service may submit that information to the Board at any meeting, or to the President, or to the Secretary, at any

2

time.  The District is required to use the least expensive bid for comparable services, including positions of employment, provided that the bidder is a "responsible bidder" as defined by State law, and meets the minimum qualifications for the position and/or service as previously determined by the board.  The minimum qualifications for any provider of service, or employee, shall be the possession of, or ability to obtain, any State-mandated certificates, licenses, bonds, and/or insurance, which may be provided by the District.  The District shall also comply with Public Contract Code Section 20680, et seq as applicable.

9.  The District, and the Board, shall have and maintain policies of security and investment of all public funds in compliance with State law, which at a minimum shall be the deposit of all District funds and monies in an interest bearing checking account.  If the District has dedicated funds for capital improvements, those funds shall be kept in a separate interest-bearing account, and only removed from that account for major repairs, expansions, or improvements within the District  An additional separate account shall be made for all deposits of customers.

10.  All Board members shall abide by, and be bound by, these Bylaws to the same extent as any other person within the District, except where a duty or policy of the Bylaws specifies a greater degree of responsibility or duty to any Director or Officer of the Board, which greater degree of responsibility or duty shall then be controlling, and Board members shall receive no preferential treatment, or discount of any District fees, as a result of their position.

11.  The Board shall not have the authority to waive the imposition of any properly applied fee applicable to any customer, or to negotiate "payment plans" with, or for, any customer.

## Section A-3, BOARD OF DIRECTORS, TERMS OF OFFICE AND DUTIES

1.  The Board shall consist of five members, each of whom shall be a registered voter residing within the District, and who shall be, and remain, current on all water charges by the District, as provided by these Bylaws.  A timely petition or appeal of charges by any member shall maintain a presumption of "current" billing status until all appeals of any disputed charges have been resolved, and the member has been given opportunity, of at least ten days after a final decision, to pay any determined amount as provided herein.  Of the five members, three shall be designated by vote as Officers, as set forth in Sections A-3.1 to A-3.3, with terms of one year in such capacity.

2.  Any vacancy on the Board of Directors shall promptly be filled by appointment by the remaining members of the Board pursuant to State law so long as there is a quorum, and by the Siskiyou County Board of Supervisors otherwise.  Any person appointed to fill such vacancy shall hold office for the unexpired term.  All terms of office of Directors shall be for four years.

3.  Any or all of the members of the Board of Directors may be recalled by the voters of the district, by following the procedures set forth in Division 11, Sections 11000-11386 of the Elections Code.

4.  A written letter must be presented to the Board for any resignation of a Director's position, but not for resignation of an Officer's seat as provided in A-3.6 below..

5.  Any member of the Board who, after receiving in-person notice of each meeting, fails to attend four regular and/or special meetings in any 12 month period, or three consecutive meetings of any type, shall be considered derelict in office, and their position on the Board shall be deemed vacant as if the member had resigned, without any action necessary by the remaining Board members, effective at the end of the last meeting resulting in the dereliction in office as set forth herein.  In the event of such a vacancy, the remaining members of the Board shall designate a replacement as provided herein, and/or by law.

6.  Any Board member who refuses appointment to any of the positions of President, Vice President, or Secretary after a proper vote by a quorum of the Board, who shall fail to faithfully and competently execute the duties of the Office to which they are appointed by the Board, or who shall fail to timely pay or appeal any and all proper charges of the District and thus whose account becomes "delinquent" for a period in excess of 10 days after personal service upon them of the

3

delinquency, shall be considered derelict in duty, and their position on the Board shall be deemed vacant as if the member had resigned, without any action necessary by the remaining Board members, effective immediately. In the event of such a vacancy, the remaining members of the Board shall designate a replacement as provided herein, and/or by law. However, a sitting officer may resign their position without also losing their seat on the Board for reasons if ill health, or other reasonable cause, with the approval of a majority of the remaining Board members, who shall vote on the question upon the request of the vacating Officer.

7. All members of the Board shall have access to all District facilities for purposes of inspection, to enforce the rules and regulations of the District, to monitor the performance of employees, and/or to assist the System Operator(s) and General Manager, and so shall posses reasonable familiarity with the operation of the facilities in case of emergency.

8. Each Board member shall, for legal purposes, be considered to be the direct supervisor of any and all District employees, although hiring, compensation, reprimand, and termination actions shall only be allowed as provided by these Bylaws, State law, or by the General Manager.

9. All Board members shall have the authority, but not the duty, to post and/or serve any and all required notices relating to water services, and/or violations of these bylaws, within the District.

10. All Board members shall have the authority to place items onto the Agenda, and to communicate with each other, and the President or Secretary for that purpose.

### Section A-3.1, PRESIDENT

The President shall be the principal executive officer of the District, unless otherwise determined by the members of the Board, and, unless a special or emergency meeting is called by a majority of the sitting Directors, shall create and post all special or emergency notices concerning the HCSD of any sort (or shall designate someone to create and post such notices), and shall preside at all meetings of the Board, may sign any deeds, notes, bonds, contracts or other instruments authorized by the Board or General Manager to be executed, except in cases in which the signing and execution thereof shall be expressly designated otherwise by the Board, shall act as point person and contact person for any press or governmental agency inquiries, shall draft and publish all official notices and announcements made, approved, or required by the Board and/or the HCSD, or those required by urgency or emergency, and shall perform, or delegate, in general all these duties, and those incident to the office of the president and such other duties as may be prescribed by the Board, and by necessity. The President specifically works closely with the Secretary to determine State, Federal, and administrative requirements that may apply to the District, and/or District employees, and coordinates with the Secretary to comply with any such legal or procedural requirements.

### Section A-3.2, VICE-PRESIDENT

The Board of Directors has given the same duties, responsibilities, and obligations attendant to the President to the Vice-President in case of the President's absence or unavailability. The Vice-President shall also be responsible for obtaining information regarding, and applying for, any and all State and Federal grants and loans that may be applicable to the District for the purpose of capital improvements and other projects that would fulfill the mission and duties of the District, as well as making general inquires on behalf of the District as needed. The Vice-President is responsible for coordinating with the General Manager in obtaining the services of a grant writer if needed, and all other necessary assistance or professional services to obtain grants and loans, subject to the provisions of these bylaws regarding open bidding, and lowest cost, and those relating to confirmation by the entire Board. The Vice-President shall assist the Secretary to obtain information concerning the creation of employee positions and all requirements attendant thereto. To the extent possible or desired, the Vice-President performs Customer contact, and refers work orders and other duties arising from such contact to the appropriate District employee(s). The Vice-President should also act as

4

Public Relations Officer, and may execute the dissemination of Statements by the board, and/or President as may be necessary to the Press.

## Section A-3.3, SECRETARY

1. The Secretary shall be responsible for maintaining and updating the District Rules and Bylaws as adopted by resolution or ordinance, and for providing official copies of the Bylaws, resolutions, ordinances, and other official acts of the District to County Counsel as necessary. The Secretary, along with the President, shall, to the extent of his own knowledge, also inform all employees and other persons of any requirement applicable to them by the Bylaws, as well as State or Federal law, regulation, or administrative rule expressed via the Bylaws, or of which the Secretary is otherwise aware. Records shall be kept as electronic files, in addition to paper files, with regular back-ups made using CD/DVD discs, flash drive, and cloud storage. Discs and flash drives shall be stored in a secure location.

2. The Secretary shall transcribe and sign all minutes of the Board of Directors, and shall prepare and post the Agenda of scheduled meetings of the Board, and of any vacancies on the board as required by law. The Secretary is the custodian of the District records and of the seal of the District, and works to execute and enforce District bylaws and policies along with the Systems Operator and General Manager.

3. The Secretary co-signs all District payments, contracts, and agreements, along with the President.

4. The Secretary is responsible for participating in, and reasonably monitoring all financial reports, District expenditures and other payments, and governmental filings, but does not have a duty to actually perform those that are solely the duty of the accountant, Bookkeeper/Clerk/Treasurer, Systems Operator, General Manager, Siskiyou County Auditor, and/or District auditor, although the Secretary shall coordinate with those persons, and assist as needed in regards to those duties.

5. The Secretary will chair the budget committee for yearly budget preparation and submittal.

6. The Secretary shall provide digital copies of all public HCSD documents to any member of the public who requests them free of charge provided such documents may be delivered by email, or at a charge of one dollar if the records must be placed on a disc, and shall provide hard copies of requested documents at a fee of five cents per page. A mailing fee shall also be charged at cost.

7. The Secretary shall maintain the District's online account with the California Employment Development Department, and shall be responsible for posting all employment and volunteer positions for the District thereon, shall, with the assistance of the General Manager, and/or Vice President as may be necessary, draft and publish all employee-related advertising and other solicitation, and shall receive all responses thereto to present to the Board.

8. The Secretary shall be responsible for advising the Bookkeeper of any messages required by the Bylaws, circumstance, or the direction of the Board, to be inserted onto the monthly customer billing statements, and may receive any such proposed notice by any member of the Board.

9. The Secretary certifies and signs all official Bylaws, acts, resolutions, ordinances, or other documents as true and correct expressions of the Board's authority, or records of the District.

## Section A-4, DISTRICT EMPLOYEES GENERALLY

1. When operating any vehicle on District business, or during the course of their employment, all employees and volunteers shall have a valid driver's license, and be insured by either their own policy, or as a rider on the District's insurance policy, with the employee responsible for any additional costs of such insurance incurred by the District as a result of their employment. Additionally, all employees, and/or persons accessing District facilities, must be acceptable for coverage by the District's general liability insurance carrier. The District does not, and shall not, pay "mileage" as part of any employees compensation package insofar as completing regularly-

assigned job duties, or getting to any portion of the Plant, works, or other facilities, or events within the District.. Volunteers may be reimbursed reasonable expenses of any sort, however.

2. All employment positions will be filled by the merit system, with the least expensive and most qualified applicant, and no favoritism or bias will be shown to any particular person based solely on genealogy, place of residence, race, gender, political affiliation, or personal history with any Board member. Except in emergency, as defined and declared by the Board, paid employment positions shall be widely advertised, in print, and/or electronically, in a radius of at least 60 miles from the District boundaries unless another means of directly contacting multiple qualified applicants exists. The Board may create employment contracts for any position, such contracts to be a term of at least one year, but no more than five years, and subject to termination by either party only upon good cause, and after full opportunity to be heard. All employment positions within the District shall be termed as "salaried" herein, but actually paid fixed hourly rates with a monthly total hours cap, classified as "part-time", and under no circumstances shall any regular position be paid hourly wages in excess of the rate and monthly total hours set by the Board, nor shall any "mileage" be paid as part of employee wages for work in and around the District.

3. Failure by any employee to perform, or to competently perform, any assigned duty, either as dictated herein, or as determined by the Board or General Manager, shall be grounds for immediate termination as provided herein, or as otherwise provided by law, and is "good cause" for termination. Complaints by citizens concerning individual employees shall be determined by a closed session hearing before the Board, with at least ten days notice to, and full opportunity to be heard by, the affected employee or his authorized representative. Failure to be qualified to obtain, possess, or maintain required licenses, insurance, or other standards shall also constitute good cause for termination as determined by the Board. No individual Director may hire or fire any employee of the District. The use of alcohol or illegal drugs by employees while on duty shall not be tolerated, and is "good cause" for termination.

4. Expenses incurred by any volunteer, employee, or Board member relating to District business shall be compensated by the District as provided by rule, and only upon the presentation of legible and complete copies of receipts and a declaration by the party seeking compensation. The Board shall establish rates for mileage and other compensation as necessary, which shall not exceed any published federal rates.

## Section A-5-1, SYSTEMS OPERATOR/GENERAL MANAGER

1. The Systems Operator (also "Watermaster" as used herein) shall see that the physical facilities related to the District's water system are kept clean and free of vermin, are in good repair and proper working order, are properly insulated, structurally sound, and painted to prevent decay, shall note violations of any water regulations, and shall perform such duties as may be assigned to him/her by the Board. The System's Operator is also the General Manager for the District as defined by California Government Code Sections 61002(f), and perform duties as described in Government Code Section 61040(a), and 61051, unless the General Manager of the District is appointed by the Board separately, and as an individual position. The position of Systems Operator is "part-time", as is the General Manager, and each shall be paid as described in Section A-4.2 in an amount to be determined by the Board.

2. The Systems Operator shall, along with the General Manager, be responsible for acquiring all chemicals, replacement parts, tools, office supplies, incidentals, and other treatment plant operational necessities, as well as any materials needed in the repair or upkeep of any District property, and shall be authorized by the Board, along with the General Manager if separately appointed, to make limited purchases, up to a maximum of $500.00, without prior authorization. All expenditures shall be noted in the monthly report, and copies of all receipts and invoices retained by the Systems Operator for use by the bookkeeper and/or auditor.

6

3. The Systems Operator shall, along with the General Manager, submit a monthly written inventory report to the Board, including any observations or notation concerning recommended maintenance relating to any District property, and shall be responsible for timely filing all water and water-processing reports, forms, or other paperwork with the State as may be required..

4. The Systems Operator shall, along with the General Manager, prepare and submit creek diversion, and/or other water rights-related reports as needed to the State, and shall submit a monthly written System's Operator's Report to the State Drinking Water Program, and to the Board to be filed in the record. This report shall contain a summary of water use, extraction from the wells and creek and treatment(s) applied, any other reports filed or required by the State, and any incurred, un-invoiced, expenses for the district related to the operations of the water system (only), as well as any events of note. The report shall also contain any recommendations the Watermaster may have concerning any maintenance needed to facilities, equipment or other property; potential upgrades to any facilities and procedures, and/or any other capital improvements within the District.

5. The Systems Operator shall, along with the General Manager, be responsible for turning on and off water service as requested by customers, and as approved or directed by the Clerk-Bookkeeper upon payment of the required fees. The Systems Operator, along with the General Manager, shall post and serve all notices relating to water services, and/or violation of the District bylaws, ordinances, or resolutions as necessary, and shall make all reports concerning illegal activity within the District to the relevant police agencies.

6. The System Operator shall, along with the General Manager, be responsible for reading the customer meters as provided by these Bylaws or direction of the Board, and the posting of notices of delinquency, and/or shut-off notices for delinquent accounts as determined by the Bookkeeper/Clerk/Treasurer.

7. The Systems Operator may hire a part-time assistant as necessary, but the assistant shall not be authorized to work more than four (4) hours per week, except in an emergency, or as previously authorized by the Board at any regular or emergency meeting. The assistant may also be the Systems Trainee, in which case the hours and duties of the Systems Trainee shall be determined by the Systems Operator/General Manager as provided herein, and by contract..

8. The State requires a certified person be responsible for the water chemistry, delivery, and chlorine levels, and so the System Operator shall possess, or be qualified to obtain during his/her tenure and/or training period with the District, all applicable licenses relating to water treatment and distribution, so that he or she may legally operate the facilities of the District. The District shall reimburse the Systems Operator for all of the costs of obtaining and retaining all such licenses and certifications, including mileage to travel to any required testing and/or educational events, but not including meals or lodging unless the required event is located more than 250 miles away.

9. The System Operator, the General Manager, or either's designee, shall read the service meters and inspect them for functionality as necessary unless meter reads have been suspended by the Board as provided herein, is responsible for the water system generally, monitors the chlorine level throughout the system and works, keeps tracks of the water levels in all storage facilities and the creek, assures all water storage is full, and that water in the system is flowing at optimum capacity, checks all tanks, and performs customer service work as approved by the Board.

10. The Systems Operator shall know, and abide by, all workplace safety regulations.

11. In the event that the General Manager is appointed as a separate position form the Systems Operator, the Systems Operator may submit his reports, recommendations, and other communications to the General Manager instead of directly to the board.

12. The General Manager is responsible for interpreting and applying all rules, regulations, policies, and Bylaws of the District, shall enforce all notices and overdue account issues along with violations by customers of the Bylaws and water use rules, shall have the power to assess and impose fees and penalties against any customer as set forth herein, and has all other authority granted to him by California Government Code 61051, and any other applicable law. The General

7

Manager further has the duty to act in the best interests of the District, even if such duty conflicts with directives from any individual Director, or the Board, when in conflict with these Bylaws.

## Section A-5-2, GENERAL MANAGER ASSISTANT/TRAINEE

1. The position of General Manager Assistant/Trainee, ("GMAT") shall be an **unpaid, volunteer position answerable directly to the Board**, in addition to being supervised and directed by the General Manager**.** Skills and ability requirements are as specified in Attachment "A" to resolution #14-007, passed on March 2, 2014, and incorporated herein as if fully set forth, and as may be amended by the Board thereafter. The duties and authorities of the position shall encompass all those of the General Manager ("GM") subject to his supervision and direction, and additionally all duties as directed by the Board, except in the event of incapacity or unavailability of the GM, in which case the Assistant/Trainee shall temporarily exercise all duties and authorities of the GM until such time as the GM resumes his duties, or the GMAT is promoted to the position of GM.

## Section A-6, DISTRICT BOOKKEEPER/CLERK/TREASURER

1. The District Bookkeeper/Clerk/Treasurer (also "Bookkeeper") shall keep the minutes of the Board of Directors meetings in one or more books provided for the purpose - insofar as is not done by the Secretary, as well as by electronic data storage, and see that all notices concerning District business are duly given in accordance with the bylaws or as required by law, by direct mail, or email. The District Bookkeeper/Clerk/Treasurer shall perform in general all duties incident to the office of District Bookkeeper/Clerk/Treasurer, and such other duties as from time to time may be assigned by the Board, or the General Manager.

2. The District Bookkeeper/Clerk/Treasurer shall submit facts and figures in a full report annually to the Board for preparation of the yearly budget, and for the purpose of any required yearly audits, and shall consult with the General Manager, the Secretary, and the County Auditor as needed in preparing this report..

3. The District Bookkeeper/Clerk/Treasurer shall have a knowledge of computerized word processing, accounts receivable, accounts payable, general ledger, profit and loss, adjusting, posting, payments, and customer billing, and is responsible for completing all billing, payroll, tax payments, lien recordation, assessment notices or documentation to the Assessor regarding stand-by fees, and all reports as required to all State and Federal agencies to the extent such are not handled by the County Auditor's, and/or Assessor's office.

4. A District financial report shall be presented by the Bookkeeper/Clerk/Treasurer at each regular meeting of the HCSD Board, and provided as a copy to the Secretary prior to each regular meeting of the Board, which shall show all expenses and income for the period since the last financial report. The financial report may also be presented by the Secretary upon notice to the Bookkeeper/Clerk/Treasurer, who will then not be required to appear at that meeting. As part of the financial report, the Bookkeeper/Clerk/Treasurer shall compile a monthly list of the District's accounts and accountings, those customer accounts that are late, are partially paid, and/or in default, and any bills due or upcoming due, so that action may be taken as by the Board.

5. The District Bookkeeper/Clerk/Treasurer shall, to the extent such duties are not performed for the District by the Secretary, the Siskiyou County Treasurer's, and/or Auditor's office(s), pick up and review mail bi-weekly, receive payments, do the deposits, keep the check books, pay the bills and any indebtedness of the District and as authorized by the Board or the provisions of the District bylaws, be responsible for all payroll duties, tax reports and governmental filings associated with funds and payments by the District, and shall perform all other usual banking and bookkeeping duties, as well as any other duties as from time to time may be assigned by the Board, or the

General Manager, and shall be bonded as required by law in an amount as determined by the Board, and the County Auditor.

6.  The District Bookkeeper/Clerk/Treasurer shall, upon authorization by the Board, set up automatic payments from the District checking account for regular, recurring bills, such as the plant telephone, the power bills for District wells, the chemical suppliers, and the like as directed by the Board. In no event shall such authorization be for an open account at any box store or merchant.

7.  The District Bookkeeper/Clerk/Treasurer shall issue completed checks for the purpose of purchases made by the Systems Operator and/or General Manager as directed by that individual, in an amount not to exceed $500.00. Such checks to be signed by any Board members.

### Section A-7, DISTRICT GRANT WRITER

1.  In the event that the General Manager, the Vice-President, or the Board as a whole, lacks sufficient skill to process applications for grants and loans to the District from State and Federal agencies, the District shall retain a Grant Writer for that purpose. The position of Grant Writer shall be an independent contractor position, and shall be subject to the open bidding, and least-cost provisions of the bylaws of the HCSD. Every effort will be made to obtain the services of a grant writer who is paid by a percentage of the actual grant money ultimately obtained by the District as the result of their efforts, rather than by direct expense to the District.

### Section A-7, SYSTEMS TRAINEE/TRAINEE WATERMASTER

1.  The Board, upon the advice and request of the Systems Operator, may confirm the appointment of a person as the Systems Trainee (also called "Trainee Watermaster" herein) by the Systems Operator, who shall be responsible for learning the operation of the water plant and other facilities within the District. The Systems Trainee shall have the duty of maintaining operation of the District facilities in the event of emergency, and when required to do so by incapacity or unavailability of the Systems Operator, and shall then undertake any and all duties of the Systems Operator in emergency, or as directed by the Board or the Watermaster. The Systems Trainee shall, after the initial training period, be an on-call, "part-time", salaried position. Further, the Systems Trainee position shall be contracted, such that should the District invest in training an individual who later willfully refuses to fulfill the duties of the Systems Trainee position within a period of two years, shall be liable to the District for any incurred costs of the initial training period. The Systems Trainee shall have all applicable certifications, and possess, or qualify to obtain, at least a "D-1" rating by the State of California.

### Section A-8, VOLUNTEERS

1.  The District may request volunteer assistance for any position within the District, and for the purpose of continuing operations in any emergency as determined by the Board, or for use on any capital improvement, maintenance, operations, or other project occurring within the District. All volunteers must complete an application and waiver of liability to be considered for a volunteer position, and the application must be approved by the President of the District, whose acceptance, or refusal to accept, any person as a volunteer may be reviewed and reversed by the Board on a majority vote. All volunteers shall be under the supervision and direction of the General Manager, who shall promptly initiate and maintain communication with all registered Volunteers for the purpose of maximizing their usefulness to the District.. The General Manager shall train, assign duties, and grant authorizations to Volunteers as needed, and as determined in the best interests of the District by him/her based upon the level of skill, knowledge, and aptitude of the individual, but shall do so as quickly as possible. Volunteer work assignments, training, and schedules are hereby declared a high priority of the District, as the use of such persons will improve the efficiency and operation of the District generally, eventually free staff for more high-function tasks, and save

9

District funds. Volunteers are considered as District employees for purposes of abiding by the Bylaws and policies of District, and for disciplinary purposes and procedures.

## Section A-9, GENERAL REGULATIONS FOR WATER SERVICE

1. In creating this Section of the Bylaws, the District does hereby adopt, and incorporate herein as if fully set forth, Section 31007 of the California Water Code. The Board may not reduce, reclassify, or waive the rates imposed by these Bylaws for any person or entity without voter approval. Property owners, or tenants within the District are not required to connect up to District water. Unless specified by contract, property owners are not liable for the water accounts with the HCSD contracted by their tenants, but shall not be permitted to have tenants sign up for water service if any former tenant has left with unpaid water charges or fees for that service. Accounts for parcels receiving water service shall be classified as "governmental", "commercial", "residential", or "other" (for use in the case of community service, temporary service, construction work, water tanker sales, etc.) Commercial uses of property include all those types of buildings and activities for which any sort of commercial zoning is required by the Siskiyou County Code, or which meet the definition of business activity as contained in Siskiyou County Code, Ordinance 3.04, save none of the exemptions therein shall apply to the HCSD. Residential customers of the HCSD have historically been charged a "minimum fee" of $39.00 per month for a base usage of 12,000 gallons per month. Any usage over 12,000 gallons per month is billed at $1.75 per 1000 gallons. Regardless of any other provision of these Bylaws, the Board may act to increase minimum fees and base gallonage for residential customers without voter approval, so long as the actual rate charged per gallon of water remains constant, or decreases. Commercial customers of the HCSD have historically been, and shall be, arranged into two tiers; "1", and "2", and charged a "base rate" of $165.00, or $225.00 per month respectively for a "base usage" of 12,000 gallons per month. Any usage over 12,000 gallons per month shall be billed at $1.75 per 1000 gallons. Tier 1 commercial accounts are those which have a 3/4" (three-quarter inch) service, serve only one building and/or business or other entity utilizing commercial zoning, and are equal to or less than 850 square feet of utilized area. All other applications or situations are Tier 2. The board specifically finds that in spite of any past billing errors and misclassifications, Governmental customers of the HCSD have historically been rated as, and shall be charged, the tier 2 commercial "base rate" of $225.00 per month for a "base usage" of 12,000 gallons per month. Any usage over 12,000 gallons per month shall be billed at $1.75 per 1000 gallons. Community service, non-governmental, facilities using minimal water (4000 gallons per month or less each month per year) shall be billed as "other" and pay residential rates at the discretion of the Board. Usages, rates, and fees shall be set by the Board as provided by these Bylaws. Each individual dwelling, inhabited, and/or inhabitable structure of any type (e.g. trailers, mobilehomes, motorhomes, tents, converted garages or sheds, etc.), or business, located on a parcel or premises where that parcel or premise has an existing connection to water service, either via one meter, or by multiple individual meters, shall be assessed a service charge as set forth herein. In order to promote uniform imposition of fees, and to prevent nepotism and favoritism by the Board or any member thereon, the Board may not waive any service fees, or any portion thereof, as set forth herein for any inhabited structure, dwelling, premises, connection, or customer. The Board may not waive the classification of any type of service connection to reduce the rate charged, which shall be based upon the actual use(s), and/or zoning(s) of the property served by the District connection. Once adopted, this section of the Bylaws as it pertains to adoption of Section 31007 of the California Water Code, to commercial and governmental accounts, and to the provision containing the prohibition of change of classification of the service connection, the prohibition of the waiver of service fees charged to any account by the Board, and the remedies permitted by private action as specified herein, may not be amended by the Board without approval of the voters within the

10

District voting on the question at a duly held election.  Further, any Board member attempting to, or directing any staff to, waive or reduce the rates and/or fees imposed  in this, or any other, section upon any individual or entity without voter approval shall be personally liable for any amount they so attempt to waive or reduce in a private action brought by any resident of, or property owner within, the District in addition to any attorney fees and other costs incurred by any such resident or property owner as a result of bringing such action.  Any such reductions or waivers made without voter approval are hereby declared to be illegal, void acts, and improperly waived fees may additionally be rebilled by the District, along with any relevant penalties,  at any time upon discovery of the impropriety.

2.      Customers must complete a Request for Service signifying their willingness and intention to comply with these bylaws and all the ordinances relating to regular water service.  The application may be completed verbally with the bookkeeper to start service, but a written application shall be completed and on file within 30 days thereafter, and thereafter again at any time as requested by the Board or the General Manager, or service will be terminated after due notice.  Applications for residential service shall include a $100.00 deposit and $40.00 application fee.  Applications for commercial and/or governmental service shall include a $300.00 deposit and $60.00 application fee.  Fees associated with applications for service for all other types of accounts as determined by the Board shall be determined by Board as needed.  Customers desiring to discontinue service should so notify the District at least two (2) days prior to vacating the premises.  Unless discontinuance of service is ordered, the customer shall be liable for regular charges associated with the account, whether or not any water is used.  Discontinued and disconnected services shall still be assessed an "availability fee" as provided by the Bylaws.

3.      Application for water service shall not be denied to any person or entity resident within the District without good cause and opportunity to be heard. However, an application for service to any particular service location will not be granted unless payment in full has been made for any water service previously rendered to the service location, and/or previously rendered to the applicant, and/or the service connection by the district.  For purposes of this section "applicant" includes any member of a family, household, communal living arrangement, corporation, LLC, or partnership, along with the person or entity actually applying for water service.  If water service is inadvertently granted to a person or persons associated with any past due account, and such fact is discovered by the District, the current account for that person will be immediately billed the outstanding balance (including any penalty assessments or fees) from the other associated account.  Any further non-payment will result in termination of service as provided herein.  In the case of service(s) to a premise that is used as a rental, in the event any tenant thereof is ever delinquent in the payment of any fees or charges assessed by the District, thereafter the District shall require that, after due notice as provided by California Water Code Section 71618 by the authority specified in California Government Code 61100, such service(s) be placed in, and maintained in the name of the person who is the owner of record of the parcel receiving service thereafter.  If the owner of the parcel refuses to be placed on the account for that service, all water services to that premise, and/or that parcel as may be servicing the rental premise, shall be terminated, and fees assed as provided herein.  Service shall not be restored until all fees are paid, and the property owner complies with this directive.

4.      Distribution mains will be extended, or new service connections installed to serve multiple dwelling previously connected to one meter, under the following terms and conditions:  Prior to the time the main is constructed, or new supply lines, saddles, and/or and meters are installed, the applicant shall enter into a written agreement for payment for all such extensions and associated work, and shall deposit with the District Bookkeeper/Clerk/Treasurer the estimated costs of excavation, installation of the main(s), secondary line(s), meter(s), and any other connections, as determined by the Systems Operator or General Manager, or any professional plumber consulted by him for the estimate.  The District shall not incur any costs related to secondary line

11

installation, cross-control devices, boxes, meters, or any other expense other than extension of the main line up to the meter in the new access box once the secondary and supply lines have been constructed to the main. All such costs shall be the sole responsibility of the property owner.

5.  Distribution mains will be extended, or new service connections installed to serve new customers upon the payment of a $500.00 capital improvement fee assessed for each new planned connection, and under the following terms and conditions: Prior to the time the main is constructed, new supply lines to the meter boxes, and the meters are installed, the applicant shall enter into a written agreement for all such extensions and associated work, and shall deposit with the Bookkeeper/Clerk/Treasurer the estimated costs of excavation, installation of the main(s), secondary line(s), meter(s), and any other connections in excess of that which is Determined by the District as minimally necessary to bring water to the property, as determined by the Systems Operator or General Manager, or any professional plumber consulted by him for the estimate.

6.  Adjustment of any substantial difference between the estimated and reasonable actual total of installed cost of the improvements specified in Sections A-9.4 and A-9.5, shall be made after the completion of the installation, and successful final inspections. The District shall be paid the amount of any excess cost, and shall refund the amount of any saving.

7.  Should the HCSD desire to install facilities greater than are needed to meet said services demands, the costs of the excess shall be borne by the District.

8.  Should the customer desire to install facilities greater than are needed for regular service, the excess costs shall be borne by the customer.

9.  Meters will be read as nearly as possible on the same day of each month, which is approximately the 25th or 26th , but the District reserves the right to vary meter read times as necessary.

10. Each meter shall service and/or serve only one business or residence parcel or address unless Board approval has been secured to the contrary. In the event of multiple residences or businesses, or both, being served by one meter, the base rate shall be charged for each such business and/or residence served by, receiving, or connected to water service, in addition to regular meter charges in excess of a single incidence of base usage amount. The buildings and persons receiving such multiple residence service from a single meter shall be responsible for apportioning any usage, so the District is only required to issue one bill.

11. As has been the historic policy and practice of the District, inactive accounts that are serviced by the District shall incur an "availability fee" based upon the zoning of the property served. Although historically the fee charged was the minimum service fee, the District has reduced the fees as of March 18, 2014 as follows: The fee is $20.00 per month for residential properties, $35.00 per month for commercial properties (of any type or designation), and $55.00 per month for governmentally-owned, leased, or utilized properties. Persons wishing to discontinue an inactive account may do so within 60 days of assuming title to the property, shall notify the District in writing, and pay a $65.00 meter removal fee, after which time they will no longer be subject to any fees or assessments of any sort by the District. The foregoing provision relating to fee waivers only applies to property owners with service accounts in good standing (or who have no past, overdue account), and who complete the appropriate application and pay the fee as set forth above- merely having the meter removed or absent from a parcel or premise for non-payment, or any other circumstances, will NOT result in waiver of the availability fee, and all due and owing amounts on any account associated with any particular service connection must be paid prior to making the application herein. Thereafter, in order to resume any type of water service to that location, a $350.00 meter reinstallation and account creation fee will be charged, in addition to any actual material costs incurred by the district, including the cost of the meter to be installed. Once a meter is removed as provided herein, any such service location that is found to be tying back into the water system in any unauthorized manner shall be assessed a $350 administrative and reporting fee per occurrence, such fee to be a direct charge against the property owner, and that service account, and the property owner(s), shall be referred to law enforcement. In order to

promote uniform imposition of fees, and to prevent nepotism and favoritism by the Board or any member thereon, the Board may not waive any minimum service fees, accessibility fees, stand-by fees, meter removal fees, administrative fees, or meter reinstallation and account creation fees as set forth herein for any connection or customer. <u>Once adopted, this section of the Bylaws as it pertains to imposition or cessation of all minimum service, meter removal, meter reinstallation and/or account creation fees, administrative fees, and the provision containing the prohibition of the waiver of such service fees charged to any account by the Board, may not be amended by the Board without approval of the voters within the District voting on the question at a duly held election.</u>

12.   A minimum water charge (base monthly rate) is the base cost for all temporary customers, but shall be further based upon the type of customer and water use as determined by the General Manager. If any temporary service, or any other water-related charges remain unpaid for 60 days, a lien for the charges, fees and penalty shall be placed upon the land for which the charges are unpaid, or upon personal property of the individual contracting for services as permitted by law.

13.   Pursuant to the Bylaws of the Hornbrook Community District as adopted and amended in August of 1996, a minimum water charge (base monthly rate - $39.00) is the cost for all stand-by customers, and shall be assessed against each parcel of land <u>not currently connected to the water system, or otherwise directly serviced by the District</u> and which lies within the District boundaries, as determined by the Board, the Siskiyou County Assessor, the Siskiyou County Clerk, and/or the General Manager, to so be within the District improvement zone. The stand-by fees shall be reaffirmed by the Board yearly, unless increased as provided by law, and collected via the Siskiyou County Assessor at the same time and in the same manner as ad valorem property taxes, and regular tax bills each year. If any stand-by charges remain unpaid, a lien for the charges, fees and penalty shall be placed upon the land for which the stand-by charges are unpaid as soon as the Board receives notice that the tax bill upon which the stand-by fees appears becomes delinquent in any amount. All stand-by fees collected shall be placed in a dedicated capital improvements account, and used for no other purpose than upgrades and repairs to the District works and facilities. In order to promote uniform imposition of fees, and to prevent nepotism and favoritism by the Board or any member thereon, the Board may not waive any stand-by fees as set forth herein for any parcel or customer, except when it is found that the assessed parcel is completely outside of the District's boundaries. <u>Once adopted, this section of the Bylaws as it pertains to imposition or cessation of stand-by fees, and the provision containing the prohibition of the waiver of such stand-by fees charged to any account by the Board, may not be amended by the Board without approval of the voters within the District voting on the question at a duly held election. Further, any Board member attempting to, or directing any staff to, waive or reduce any standby fee in this section which has been duly imposed upon any individual or entity without voter approval shall be personally liable for any amount they so attempt to waive or reduce in a private action brought by any resident of, or property owner within, the District in addition to any attorney fees and other costs incurred by any such resident or property owner as a result of bringing such action.</u> The Board shall act timely each year to assure the continuation and imposition of the stand-by fee at the rate originally set, unless proper engineering and other analysis is provided justifying any increase as provided by law.

14.   Property owners with past due balances for any fees or charges on their water bills and/or accounts in excess of 60 days may have a lien filed on the property to which the water service was delivered as provided by State law. <u>All fees</u> incurred by the District associated with collection from the property owner, their heirs, or assignees, of any fees and charges, and/or placement of the lien, including attorney's fees and/or collections costs, will be payable by the property owner. If a property owner's tenant defaults on a water service account, thereafter no service will be provided to that location unless the account for such service is in the property owner's name, although the General Manager or Board may permit joint accounts.

13

15. No customer shall knowingly permit leaks or waste of water. Where water is wastefully or negligently used on a customer's premises, and/or seriously affecting the general service, the District may discontinue the service is such conditions are not corrected within five days after giving the customer written notice. De minimus infractions shall not be cause for termination of service under any circumstances, although the District may impose an inspection, or enforcement fee, or surcharge. Normal usage of water, and the watering of food plants, shall under no circumstances constitute "waste" for purposes of this rule. No pasture irrigation is permitted.

16. The customer shall use all possible care to prevent damage to the meter or any other facilities of the District. If any damage is done, the cost of making repairs shall be paid by the party responsible for the damage. If damage, and the party responsible therefore, is not reported by the property owner of the premise receiving service within 10 days of the damage to District property, that damage shall be presumed to be the responsibility of the property owner. Damage to locked out services, including locks, meters, meter boxes, and any other District property, shall be the responsibility of the customer, and water service to that location shall not be resumed until all charges for damages, and any necessary repairs, have been paid.

17. There shall be no water used through the Fire Protection service except to extinguish fires and for testing or cleaning the pipes and hydrants comprising the fire fighting equipment. Water may be obtained for filling tanks connected with the fire service. Water shall not be provided to any corporation or private entity, nor to any County, State, or Federal agency or entity except pursuant to a contract ratified by the Board, and then water shall be actually disbursed to any contractors only under the direction and supervision of the Systems Operator/General Manager or his designee, and only from a water source that is not treated, potable water if at all possible (e.g. wells within the district whose water is generally too salty, high sulfur, or contaminated for drinking.) The Board shall act, in cooperation with local fire agencies, to install tanks, pipes, and other structures to marginally, or non-potable, water supplies for the purpose of their utilization in an emergency.

18. The District assumes no responsibility for any loss or damage suffered by any individual, entity, or item of property, due to lack of water or pressure as are available in its general distribution system.

19. The District shall not be liable for damage which may result from an interruption in service. Temporary shut downs may be made by the water department in emergency, drought, or to make improvements and repairs. Whenever possible and as time permits all customers affected will be notified prior to any interruptions in service.

20. Only duly authorized employees or agents of the District will be permitted to install a service connection from the district's main to the customer's premises, or to inspect cross connections, although such authorized agents may be plumbers and other contractors licensed by the State of California as hired or approved by the General Manager.

21. Customer's making any material change in the size, character or extent of the equipment or operations utilizing water service, or whose change in operation results in a large increase in the use of water, shall immediately give the District written notice of the nature of the change and if necessary, amend their applications.

22. The District's first obligation is to provide available service connections for the people within the District that do not have water, or who do not have adequate water, before taking on outside customers.

23. All facilities from water source, to meter service end, shall be the property of the District.

24. No person shall assault, obstruct, or threaten with physical violence, any Board Member, or employee of the District in the performance of their duties. Any person so doing will be in violation of these Bylaws, and subject to all civil and criminal penalties as provided by law. Additionally, any person engaging in any clearly abusive, or threatening conduct or criminal speech to any person, and who is an employee of the District, shall be immediately terminated from employment as soon as any Director, or the Systems Operator, and/or the General Manager,

14

becomes aware of such conduct, although any such termination may be appealed to the Board within 10 days, after which the Board may ratify the termination, or take any other appropriate action regarding it. Voicing intent to exercise a legal right is not a violation of this provision.

25. No person shall willfully obstruct or damage the water meters and other facilities, or any access thereto. Any person so doing will be in violation of these Bylaws, shall be billed for the cost of any damage and/or repairs, and subject to all civil and criminal penalties as provided by law. Services where there is any obstruction of meter boxes by vehicles, or other large and/or numerous items shall incur a $45.00 administrative fee at the discretion of the General Manager.

26. Any parcel served by the District via a connection to the mains, and that also has a well in service shall have a cross-connection and/or check valve device installed between the meter and the line to the property. Such check valve and/or cross connection device shall be inspected and tested yearly, or as required by the District, by a certified and licensed plumber paid for by the customer, or may be inspected by the District at a cost of $65.00 to the customer per inspection. Any device which fails must be replaced within 30 days, or water service will be shut off, with all consequent fees imposed, and no service shall resume until a certification is obtained that a functioning device has been properly installed and tested..

26. All persons who are customers or residents of the District, or who own property within the District boundaries, shall have a right of private action, concurrent with the rights of the District in all respects, to enforce any provision of these bylaws, including one based upon any person or entity's failure to pay any of the fees and charges due as set forth herein when due, or in the case of the District, failing to act to collect any properly due fees and/or charges, by writ petition and/or civil action, against any violator, including any Director, and/or the District itself, pursuant to the Private Attorney General Doctrine, and specifically incorporating the provisions and remedies of California Code of Civil Procedure section 1021.5. For purposes of this part, any enforcement of the District Bylaws by any person shall be deemed to constitute a "significant public benefit", while any violation of the Bylaws shall be deemed to constitute a "nuisance per se" for purposes of this section and the rights of action granted hereby. Once adopted, the provisions of this section may not be revoked or modified by the District Board of Directors, and may only be modified or repealed by the voters of the District at a regularly-held election on the question.

## MEETINGS

1. Regular meetings of the Hornbrook Community Services District are held the 1st Tuesday of each month, at 10:00 a.m., unless that Tuesday falls on a holiday or there is an emergency, in which case the regular meeting shall be held the following Tuesday. However, the President, or a majority of the Directors, may designate the date, time, and place, of regular meetings, and any special or emergency meetings, upon proper notice, and the Board may reset the time and place of monthly regular meetings as necessary for the timely transaction of business, to suit the needs of the individual Directors and/or the community, as facilities become available, or encourage and facilitate attendance of the meetings by the public, or any other lawful purpose.

2. At least 72 hours before a regular meeting, and at least 24 hours before a special meeting, the President of the Board, the Secretary, or the designee of one or both of those officers, shall post an agenda containing a brief general description of each specific item of business to be transacted or discussed at the meeting, and shall conform in all ways with applicable laws. The agenda shall specify the time and location of the regular meeting and shall be posted in a location that is freely accessible to the members of the public. No action shall be taken on any item not appearing on the posted agenda, but the Board may take action on items of business not appearing on the posted agenda by a majority vote of the Board if an emergency situation exists, or if a finding is made by unanimous vote of those members present, that there is a need to take action on a subject that arose subsequent to the agenda being posted.

15

3.  A special meeting may be called by the President or by any of the Directors. A written notice or telephone call regarding any such special meeting is to be given to all the Directors. Email shall be considered written notice. At least a 24 hour notice must be given, and the time and place where the meeting will be held. The notice must also be posted in a location that is freely accessible to the public, and the business to be transacted. No other business shall be considered.

4.  The Board of Directors must hold closed executive sessions during a regular or special meeting to hear complaints or charges concerning District matters as provided by law, and the Board shall make a report on any such closed session.

5.  All District records other than those reflecting personal information of individual employees are to be considered public records, and in the case of documents containing personal employee information, copies of such documents, with the personal information of the employee(s) redacted therefrom, are public records. Records retention and digitization is declared a high priority.

6.  At regular and special meetings, the public may comment on items either on the agenda, of public concern, or of interest to the Board. Public comment may be limited to three (3) minutes per person per agenda item, in addition to any time for comment on a non-agenda item, or such additional time as the Board may allow. Comments directed to issues not on the Agenda may not be addressed at the meeting by the Board, but may be placed on the next Agenda for further consideration and possible action by the board. The District policy relating to public meetings is that public discussion concerning problems faced by the District is to be encouraged whenever reasonably possible, as community issues often benefit from community solutions, but that pointless bickering and undue consumption of meeting time interferes with the District's business, and thus such will be discouraged as a disruption. Written comments are to be encouraged.

7.  In the event of any circumstance or occurrence which in the opinion of any Director constitutes an emergency severely impacting the functioning or operations of the District, or the health and safety of the residents thereof, the Board may adopt any ordinance or resolution to have immediate effect upon majority vote of the quorum present at any regular or special meeting. A specific finding by the Board of each of the facts and circumstances constituting the emergency shall be made and put on the record, and be subject to appeal or other redress by any citizen upon application thereby.

## Title 1. Water Services

### Section 1-1.010. Generally.

For the purpose of this title, the words used in this chapter shall have the meanings as set forth in each section.

### Section 1-1.020. Applicant.

"Applicant" means the individual or entity requesting water service and who agrees to be financially responsible for payments of the service billings. All applications shall contain language providing for attorney, collection, and/or any other fees incurred by the District in attempting to resolve any dispute with any Applicant or Customer regarding non-payment of water charges.

### Section 1-1.030. Board.

"Board" means the Board of Directors of the Hornbrook Community Services District.

16

**Section 1-1.040. Bookkeeper/Clerk/Treasurer.**

"Bookkeeper/Clerk/Treasurer" means the District employee authorized to collect and make deposits and payments for water services, and, to the extent such services are not provided by the Siskiyou County Assessor and/or Auditor's office(s), create billing and other customer notices, reconcile accounts, make payments for the District as authorized by the Board, make at least monthly reports to the Board, track and notify the Board, General Manager, and the Watermaster of all overdue accounts, and refund amounts due back to customers. The provisions of Section A-6, above, apply herein. The Bookkeeper/Clerk/Treasurer shall possess computer, typing, and any other relevant skills as required by the board, and shall create databases concerning customers, service addresses, accounts, water usage, delinquencies, etc, and be able to extract data as needed by the General Manager, and the Board.

**Section 1-1.050. Cross-Connection.**

"Cross-connection" means any physical connection between the piping system from the District service and that of any other water supply not owned and operated by the District, whereby water from the non-District source may be forced or drawn into the District distribution mains. Any property or dwelling connected to the District service that has such a cross-connection shall be required to install an approved check-valve between the district meter and the service line leading to the property or dwelling, and to have such cross-connection inspected and approved by the Systems Operator, or a currently licensed plumber prior to use, as well as annually thereafter, and failure to do so shall result in termination of water service. Customers shall be responsible for all costs associated with inspection, testing, and maintenance of cross-connections. Failure to timely test and repair cross connection devices upon direction of the General Manager or Watermaster may result in termination of water service after 30 days notice at the discretion of the Watermaster, General Manager, the Board, or as directed by the State.

**Section 1-1.060. Customer.**

"Customer" means a natural person, his heirs and personal representatives; a firm; co-partnership; joint venture; association; social club; fraternal organization; corporation; estate; trust; trust business; receiver; syndicate; or any group or combination acting as a unit receiving or seeking to receive water services from the District. All persons living together in a residence, or in separate residences serviced by one meter when water charges are incurred, regardless of relationship status towards each other, shall be considered as one economic unit insofar as the District is concerned, and shall be jointly liable for all water, and any other charges incurred at that residence. Commercial circumstances, such as apartments, duplexes, hotels, or mobile home/trailer parks are exempt from this rule to the extent of the separate units.

**Section 1-1.070. Distribution mains.**

"Distribution mains" mean water lines in streets, alleys and rights-of-way used for general distribution of water from which service is available to the customer via a saddle and meter assembly, or any water line from which secondary lines run to a saddle and meter assembly.

**Section 1-1.080. District.**

"District" means the Hornbrook Community Services District ("HCSD").
**Section 1-1.090. Firefighter.**

"Firefighter" shall mean a paid or volunteer member of an organized fire department, or a member of the Board of Directors of the Hornbrook Fire Protection District, acting in his or her capacity as authorized by that department, or by the Board of Directors of the Hornbrook Fire Protection District.

17

## Section 1-1.100. Premise.

"Premise" for the purpose of these regulations means a lot or parcel of property under one ownership (regardless of if that "ownership" consists of multiple persons or entities), except where there are well defined boundaries or partitions such as fences, hedges or other restrictions preventing the common use of the property by the several tenants, in which case each portion shall be termed separate premises. Apartment houses and office buildings may be classified as single premises. The term "premise" shall not apply to the interior of any dwelling for purposes of these Bylaws.

## Section 1-1.110. Property Owner.

"Property Owner" means the person to which the property was assessed in the last equalized assessment roll of the County of Siskiyou unless the Board, or District Bookkeeper/Clerk/Treasurer has knowledge of the name of a person other than such assessee claiming recorded ownership of the property.

## Section 1-1.120. Regular service and service connection.

"Regular service" means water service rendered for normal domestic, or commercial purposes on a permanent basis and for which the general rate and regulations are applicable for that particular connection type. "Service connection" means the connection, consisting of the saddle and meter, through which flows water from the District mains to the customer's premises.

## Section 1-1.130. Service area.

"Service area" means that description of all real property that is legislatively determined through a resolution adopted by the majority vote of the Board from time to time promulgated, amended or substituted which describes the area to which water services shall be made available, and/or which is within the boundaries of the District as determined by the Siskiyou County Clerk, and original LAFCO application maps for the HCSD. Any change in the Service Area must be approved by the voters residing in the District. No water service shall be provided outside the service area. No potable water shall be supplied to any agency or entity for the purpose of any sort of road, or construction work. The current service area is all of that land, and the parcels comprising it, which lay within the boundaries of the District as determined at the time the District was formed, and any amendments thereto since.

## Section 1-1.135. Improvement District.

"Improvement district" means that description of all real property that describes the area to which water services can, or shall be made available as provided in these Bylaws, and which is within the boundaries of the District as determined by the Siskiyou County Clerk, and original LAFCO application maps.

## Section 1-1.140. Service.

"Service" or "serviced" means the provision of water to customers by means of the District water system.

## Section 1-1.170. Systems Operator.

"Systems Operator" and/or "System Operator", means the District employee designated to inspect, operate and maintain the water supplies, water plant, and any and all parts of the water system, and who

may also be the General Manager of the District.  This term is synonymous with "Watermaster" as used herein.

### Section 1-1.180. Tenant.

"Tenant" shall mean any occupant of a premise provided water by the District via a regular service connection, and which occupant is other than the property owner.

### Section 1-1.190. Tense, gender and number.

Words used in this title in the present tense includes the future as well as the present; the masculine gender includes the feminine and neuter; the singular number includes the plural.

### Section 1-1.200. Temporary service.

"Temporary service" means water service especially installed for construction work and other uses.

### Section 1-1.210. Water Capitalization Improvement Fee.

"Water capitalization improvement fee" means the fee to be paid by the customer at the time of a newly constructed service connection.

### Section 1-1.215. Water Capitalization Improvement Fund.

The Water Capitalization Improvement Fund is all those monies collected by the District pursuant to Section 1-2.030, as stand-by fees, and/or by property taxes levied for that purpose, whether or not those monies are deposited in any particular bank account or other investment instrument.  This fund shall be tracked and treated by the District Clerk/Bookkeeper/Treasurer, and/or the County Auditor, as separate funds, and shall be used only for the purpose of capital improvements or repairs within the District. Whenever feasible, the District shall create a separate savings account specifically for housing these funds.

### Section 1-1.220. Water system.

"Water system" refers the District's water delivery system, treatment/distribution plant and works used for public and private use, including all parts of the enterprise; lands; easements; inland rights; water rights; contract rights; water supply storage and distribution equipment and facilities; and the pipeline and appurtenant facilities such as the curb stop, meter and meter box used to extend water service from the distribution main to the customer's premises. It does not include any pipe or device located between the water meter and the customer's dwelling/residence.

## Chapter 2. Water Service Regulations
### Section 1-2.010. Water System Priorities.

The District shall supply water via its water system according to the following priorities:
A.  Existing District customers without wells.
B.  Existing District customers with wells.
C.  Residents or businesses within the District service area who are without water service.
D.  The District shall at all times endeavor to expand its water generation, and storage capacity.

**Section 1-2.020. Application and Deposit.**

Prior to receiving water service, all customers, including those seeking temporary service and those applying for new connections, must complete an application signifying their willingness and intention to comply with all ordinances related to water service. Customers shall not be required to waive any legal or statutory rights by completing the application. All persons living together in a residence when water charges are incurred, regardless of relationship status towards each other, shall be considered as one economic unit insofar as the District is concerned, and shall be jointly liable for all water, and any other charges and/or fees incurred at that residence to the extent that all such charges must be paid before any member of that economic unit may establish an account with the District, or receive water service, in their individual capacity, regardless of location within the District.

All customers shall pay the following fees and charges as applicable:
1) a deposit in the amount of $100.00 for an initial residential service account, as well as a $40.00 application fee;
2) an initial deposit in the amount of $300.00, as well as a $60.00 application fee for commercial or governmental service account.

An amount of $45.00 for residential customers, and $65.00 for commercial customers, or as established by the District in accordance with Section 1-5.010 shall be paid by and customer in the event of any shut-offs for non-payment or other events. The charge to turn water back on after it has been shut off for non-payment, failure to comply with a reasonable direction of the District or any District employee relating to water service, or any violations of the Bylaws shall be an additional $45.00 for residential customers, and $65.00 for commercial customers. In the event of shutoff service, a $10.00 notice fee shall be applied to all accounts. Other charges shall be assessed to the customer as provided in these Bylaws, and by Resolution - all of which, save the actual charges for water service, shall be subject to timely and proper written appeal to the Board. A timely appeal shall be one that is received within 15 days of the billing date for the imposition of the challenged fee, or date of notice of the violation of the Bylaws. Untimely appeals shall be dismissed without hearing on the basis of a lack of jurisdiction by the board absent a showing of good cause for the delay, but in no event shall any appeal be considered timely that is filed in excess of 30 days past the date of the incurred fee or notice of violation of the Bylaws. If any water charges, penalties, or other fees assessed remain unpaid after 60 days, a lien for the charges, fees and/or penalties shall be placed upon the land for which the charges, fees and/or penalties are unpaid, and/or upon the personal property of the individual contracting for services as permitted by law.

All customer deposits shall be placed and maintained in a separate account from regular revenue. Initial Deposits shall be returned upon discontinuance of service and after full payment of water bills, or, in the case of residential customers, upon application of the customer after 12 months of timely, full payments of all charges.

Any misstatement on any application, or request for service, shall be grounds for immediate termination of service. Any violation of the District's Bylaws other than for non-payment shall be grounds for immediate termination of service upon due notice and opportunity to be heard.

**Section 1-2.030. Water Capitalization Improvement Fee.**

Any customer applying for a new connection shall pay a non-refundable water capitalization improvement fee in the amount of $1,250.00, or $500.00 if the customer provides all materials, labor, and inspections, as specified by the District, to bring their proposed service line to the District main, and connect thereto; or an amount established by the District in accordance with Section 1-5.010 - whichever

20

is greater. Such fees shall be allocated to the Capital Improvement Fund, and shall be used for no purpose other than capital improvements and repairs within the District. This fee does not include any actual costs for materials or labor, which are the responsibility of the respective parties as otherwise provided herein

### Section 1-2.040. District Control of Service Connection.

The service connection, including any meter or meters, along with any associated boxes, lids, valves, and the like, whether located on public or private property, is the property of the District and the District reserves the right to inspect, repair, replace, and maintain any service connection as well as to remove it upon discontinuance of service.

Representatives of the District have the right to ingress and egress to the customer's premises at reasonable hours and upon reasonable notice for any purpose reasonably connected with the furnishing or termination of water service, to locate or inspect meter boxes, to inspect meters, to locate or inspect cross-control and check valve devices, or to respond to an emergency situation as determined by the District. Premises where there is any obstruction of access to District facilities or property, particularly meter boxes, by vehicles, or other large and/or numerous items shall incur a $45.00 administrative fee per day and/or occurrence, at the discretion of the General Manager.

### Section 1-2.050. Laying of pipes.

All water pipes connecting to the District water service which are laid, re-laid or repaired on any private premises or any public place within the District shall be subject to inspection by the Systems Operator, the General Manager, or either one's designee, before such water pipes are covered.

### Section 1-2.060. Service Connections and Water Meters.

New service connections and water meters will be installed to service new customers under the following terms and conditions:

A.      The applicant shall enter into a written agreement for such installation and shall deposit with the District the estimated cost of installation of all new components as determined by the System Operator.

B.      In addition to the cost of installation, the applicant shall pay the District a non-refundable capital improvements connection fee in an amount determined in accordance with Section 1-5.010.

C.      Upon completion of installation, the actual cost shall be determined and an adjustment made as an additional charge, refund or credit.

D.      Should the District desire to install facilities greater than are needed to meet the service demands of the applicant, the cost of the additional installation(s) shall be borne by the District.

E.      Each meter shall be installed to service only one premise and/or inhabitable dwelling unless District approval has been secured otherwise. Violations are subject to summary disconnection.

F.      The System Operator may authorize a licensed contractor employed by the applicant to install a service connection from the District's service main to the applicant's premises. All connections and meters which are the property of the District shall be regularly inspected for leaks, and repaired if defective. Such inspection and repairs to be the responsibility of the District.

21

**Section 1-2.070. Fire Hydrant Use.**

No person other than firefighters and authorized employees acting within the scope of their employment of the District shall turn on any fire hydrant within the District. No Director or District employee or agent other than the Watermaster orGeneral Manager shall have the authority to turn on any fire hydrant without full authorization of the Board acting as a body. Any unauthorized person turning on a fire hydrant within the district shall be in violation of this section, and any applicable State laws. Further, the District will consider such an act one of vandalism and/or theft depending on circumstances, and take appropriate legal action against the perpetrators.

**Section 1-2.080. Shutoff – Firefighting.**

In case of fire alarm, all residential and commercial water use shall be immediately shut off throughout the District so as to maintain sufficient pressure for firefighting, excepting that water for use at the fire and the immediate neighborhood shall not be shut off. Any person, while an emergency is occurring, and while acting in an official capacity of the District, may enter upon any premises within the District for the purpose of closing any hydrant or water outlet that may be open at such time. The water shall remain turned off and the consumers shall not again use any water until the signal that the fire has been extinguished and the all clear has been given by fire officials.

**Section 1-2.090. Shutoff – District Authority Generally.**

The District reserves the right, with reasonable and proper notice, to shut off the water supply for repairs, extensions, nonpayment of fees and/or properly levied charges, false representations by a customer, discovery of fraud, discovery of association with a past delinquent account, chronic wastage, violation of the District Bylaws or policies, or any emergency situation as determined by the District, and the District shall not be responsible for any damage, such as bursting of boilers supplied by direct pressure, the breaking of pipes or fixtures, stoppage or interruption of water supply, or any other damage resulting from the shutting off of water.

**Section 1-2.100. Meter Damage.**

Any costs relating to negligent, willful, or willfully negligent damage to a water meter or its housing and support structures shall be the responsibility of the person allowing or committing the damage. In such event, the District shall have the authority to repair any damage to any such meter and assess the cost of repair against the person causing or permitting the damage to occur, in addition to any other remedy provided by law. Willful damage to any District meter or other property shall additionally be subject to any other criminal and/or civil penalty provided by State and/or County law.

**Section 1-2.110. Meter Obstruction.**

If District personnel are unable to access a water meter for reading due to any obstruction placed there by any persons beyond the control of the District, the District is authorized to bill the customer in question based upon the previous month's usage, and for any employee time associated with the need to access the meter, with any discrepancy corrected at the next regular reading. Any differential in charges based upon actual usage will be accounted for in the following month's bill. The District is authorized to give notice to remove any such obstruction upon one (1) days notice, or one (1) hour's notice in emergency, or immediately if accessing the service for water shut-off of any sort. If the customer does not remove the obstruction, the District shall remove it and charge a reasonable fee for removal. Vehicles obstructing District property/resources will be towed at the owner's expense if not immediately moved on request.

**Section 1-2.120. Temporary Service.**

Temporary service will be furnished in conformity with the general regulations as set forth for regular water service and as additionally specified in this section.

Temporary service connections shall be disconnected and terminated within six (6) months after installation unless an extension of time is granted in writing by the District.

The applicant shall deposit, in advance, the estimated cost of installing and removing the facilities required to furnish such temporary services. Upon discontinuance of service, the actual cost shall be determined and an adjustment made as an additional charge, refund or credit.

All connections of temporary service to a customer's premises shall be made either by the District or by a licensed contractor employed by the customer and authorized by the System Operator and/or General Manager shall be operated in accordance with the District's regulations.

The rates for regular service shall be applicable for water used from temporary services. Where it is not practical to install a meter, the water consumption may be estimated on a basis agreeable to both the customer and the District. The applicant shall pay the estimated cost of water in advance, or shall otherwise be required to establish credit. The minimum charge for water shall be the minimum as established by District resolution.

## Chapter 3. Delinquent Water Charges
**Section 1-3.010. Payment of Bills, Penalties for Non-Payment, and Termination of Service.**

Water statements for service are due and payable at the time the bill is received by the customer each month. If no bill is received by the customer by the 7th day of any month, regular charges are still due for any active service, or for accessibility fees for any inactive service. If the full amount due is not paid by the 15th day of the month in which the payment is due, a penalty of $5.00 for residential customers, and $25.00 for business or governmental customers shall be added by the Bookkeeper/Clerk/Treasurer of the District to the amount due for each month of late payment of any amount due, in addition to any other penalties prescribed by these Bylaws, or by action of the Board.

If the amount due on any account is not paid in full by the 45th day of delinquency, or if the customer fails at any time to abide by any installment plan dictated by the General Manager, the water service shall thereafter be terminated at the discretion of the District via the General Manager, after a minimum of two day's notice, giving the precise date of planned shutoff, provided to the customer via personal service, posting on the premises, or "doorhanger". Any account that receives a shutoff notice will incur a $10.00 notice fee. Any account that has water shut off will incur a $45.00 shutoff fee. Any service and/or account whose meter is obstructed within 24 hours after receiving a shutoff notice shall incur a $75.00 administrative fee, in addition to any costs incurred by the District in removing the obstruction. A reconnection fee of $45.00 will be charged to resume service in addition to required payment of all fees, and past due charges. Additionally, any such account's deposit shall not be returned (as provided in Section 1-2.020) other than upon termination of service, and settlement of the account. If the account has already had any existing deposit refunded per Section 1-2.020, it shall be required to re-post the original deposit of $100.00 for the account, which shall not thereafter be returned (as provided in Section 1-2.020) other than upon termination of service, and settlement of the account. Any customer wishing to pay their account after receiving a shutoff notice should deposit the payment in the red payment box, and/or contact

23

the Bookkeeper, General Manager, and/or the Systems Operator of the District. Payment may also be made, for the exact amount due, to the employee arriving at the service connection to shut off water.

Any account with a balance more than 60 days past due will incur an interest charge equal to 10% per annum, and be subject to collection action(s). The District shall be entitled to any costs incurred that are associated with collection, and/or other legal action relating to the account, including attorney fees.

If any person or entity with an account that is billed for water services, or other District fees, states at any time to any District employee or Board member, either verbally, or in writing, that they do not intend to pay the amount due, then that account holder shall be immediately personally notified, and/or notice posted at the location of service of impending termination of all services by the District within 48 hours. All normal posting, notice, disconnection, reconnection, and any other properly assessed fees shall apply in such a circumstance, and service shall be reinstated until all due amounts are paid, along with the applicable deposit for the type of service rendered. No Board member shall waive any such fees.

After 65 days of any delinquency in excess of $50.00 existing on any account under any circumstances, water service shall be terminated after a minimum two day notice, setting forth the date and approximate time that water service will be terminated. A reconnection fee of $45.00 will be charged to resume service in addition to required payment of all past due charges. Additionally, any such account shall be required to post an additional total deposit in the amount of 150% of the original deposit amount for the account, which shall not be returned (as provided in Section 1-2.020) other than upon termination of service, and settlement of the account. No Board member shall waive any such fees.

Under no circumstances shall any installment plan afforded to any customer of the District to bring an account current exceed a timeline of 60 days in total delinquency, and/or 35 days after receiving a shutoff notice, and any such plan shall include the provision of a minimum payment of 50% of the balance due on the account or service location upon its inception, along with continuing payment of all regular charges and fees as such may become due on the account during that time. Any failure by the customer to comply with the terms and conditions of a repayment plan at any time shall be grounds for immediate termination of water service. Any repayment plan shall be granted at the sole discretion of the General Manager.

Any penalty or consequence of a failure by the customer to timely pay their bill, save those which result in actual costs being incurred by the District (e.g. employee time to hang notices and turn off/on water, etc), may be suspended by the Board upon timely written appeal of the customer filed within 15 days of any billing, event, or imposition of penalty, for consideration at the next regular meeting of the Board of Directors, who shall give the customer full opportunity to be heard, and thereafter inform the Bookkeeper/Clerk/Treasurer of any relief granted to the customer within 10 days. The Bookkeeper/Clerk/Treasurer will thereafter timely notify the customer as to the decision of the Board, which shall be considered a final decision for all purposes. Failure to timely appeal any billing or other event in writing to the Board waives the defect of the billing, and will be presumed correct thereafter.

If any water charges, penalties, or other fees assessed remain unpaid after 60 days, a lien for the charges, fees and/or penalties shall be placed upon the land for which the charges, fees and/or penalties are unpaid, and/or upon the personal property of the individual contracting for services as permitted by law.

Under no circumstances shall the Board, or any member thereof, waive any duly incurred, and properly imposed, water charges, monetary penalties, or fees, for any customer, and waiver of non-monetary penalties (e.g. water shut-off) may only be upon the basis of clearly demonstrated and established unavoidable emergency, provable misreliance upon agency, or third party neglect (e.g. failure by the bank or landlord to make an authorized payment). Once adopted, this section of the Bylaws as it pertains to

24

prohibiting the waiver by the Board of any duly and properly imposed charges, penalties, and/or fees, may not be amended by the Board without approval of the voters within the District voting on the question at a duly held election. Further, any Board member attempting to, or directing any staff to, waive or reduce any duly and properly imposed charge, penalty, and/or fee in this section without voter approval shall be personally liable for any amount they so attempt to waive or reduce in a private action brought by any customer or resident of, or property owner within, the District in addition to any attorney fees and other costs incurred by any such customer, resident, or property owner as a result of bringing such action.

### Section 1-3.020. Returned Checks.

If payment for water service is made by check and that check is returned due to insufficient funds, a closed account, or any other reason, water service shall be terminated as provided in Section 1-3.010 after the check is returned and the customer is given notice and opportunity to pay the bill by other means within 10 days. Also, an additional charge of $35.00 will be added to the water statement for each returned check received by the District.

### Section 1-3.030. Customer Obligation.

When service is discontinued for nonpayment, it shall not be again resumed until payment of all charges and penalties is made for that service connection.

When payment of all charges has been made, and a new deposit tendered, service shall be resumed.

### Section 1-3.040. Reconnection Fee.

When water service is discontinued due to nonpayment of bills, returned check, or other noncompliance with District regulations, service shall not again be resumed until payment of all charges and fees due is made, including a reconnection fee of $45.00, or as set by the District in accordance with Section 1-5.010.

### Section 1-3.050. Delinquent Charges – Report Transmitted To Board.

A report of delinquent charges shall be transmitted each month to the Board by the District Clerk/Bookkeeper/Treasurer, and to the General Manager at any time the record reflects a delinquency as to any account or service. Upon receipt by the Board of the report, it shall fix a time, date and place for hearing the report, and any protests or objections thereto if any such have been timely filed, but not otherwise.

### Section 1-3.060. Delinquent Charges – Hearing.

At the time fixed for consideration of the report, the Board shall hear it with any objections of the customers liable, or assessed for delinquent accounts. The Board may make such revisions, corrections, or modifications of the report as it may deem just, subject to the limitations contained in these Bylaws; and in the event the Board is satisfied with the correctness of the report (as submitted, or as revised, corrected or modified), it shall be confirmed or rejected by resolution. The decision of the Board on the report and on all protests or objections thereto shall be final and conclusive.

### Section 1-3.070. Delinquent Charges – Method of Collection.
Any method authorized by law will be used in the collecting of delinquent charges, past due accounts, and written-off accounts, including the employment of counsel to court actions, and/or transfer of the account to a collections agency. All collection-related fees and charges shall be added to the account.

Chapter 4. Cross-Connection

**Section 1-4.010. Cross-Connection Control Required.**

It is the District's responsibility to follow State law and protect its potable water distribution system from contamination or pollution due to the backflow or back-siphonage of contaminants or pollutants through the water service connection. In the case of a parcel with a well, or in the judgment of the District System Operator or General Manager, a backflow prevention device or check-valve is required at the District's water service connection to any customer's premises for the safety of the District's water system, the System Operator shall give notice in writing to said customer to install such an approved device or valve at each service connection to his or her premises. The customer shall immediately install such device at his or her expense. Failure, refusal or inability on the part of the customer to install such device shall constitute grounds for discontinuing water services until such device has been properly installed.

**Section 1-4.020. Approved Standards for Cross-Connection Control Devices.**

Any backflow device or check valve required by this code shall be a model and size approved by the State of California Department of Health Services.

**Section 1-4.030. Approval of System Operator Required.**

Prior to the installation of any cross-connection control devices or check valves, the customer shall submit to the System Operator a statement containing the make and model of the device or valve to be installed, and the location and method of installation. Failure to submit such information could result in the installation of a non-approved device and the termination of water services.

**Section 1-4.040. Annual Inspection of Cross-Connection Devices Required.**

It shall be the duty of the customer at any premise where cross-connection devices or check valves are installed to have inspections and operational tests conducted on said devices or valves each year, and/or as required by the System Operator or General Manager. Inspections and tests shall be done at the customer's arrangement and expense and shall be performed by the device manufacturer's representative, a licensed plumber certified to conduct cross-connection testing hired by the customer who shall thereafter submit a report and copy of the invoice relating to the inspection to the District, the Systems Operator, General Manager, if either are certified to do so, or either's certified designee.

It shall be the duty of the District to insure that system inspections and tests are made. The customer shall notify the District in advance of these tests so that they may be observed if necessary, and shall provide a copy of the test results to the District. Cross-connection devices shall be inspected, repaired, overhauled, and/or replaced at the customer's expense at any time they are found to be defective, or as notified by the District, and failure to do so will result in termination of water service unless the well relating to the device is removed. Records of all tests, repairs or replacements shall be made available to the District.

**Section 1-4.050. Right of Entry for Inspections.**

If any agent of the District has reasonable or probable cause to believe a potentially dangerous, hazardous, or wasteful condition exists, or that any violation of the Bylaws or Policies of the District have been, or are occurring at any location receiving water service from the District, an authorized representative of the District shall have reasonable access, upon reasonable notice, to the exterior of any premise supplied with water for the purpose of making inspections relating to such circumstances.  District employees shall also

have the right, upon reasonable notice, of access to all cross-connections control devices on any premise, and for making inspections of the water system, and water meters upon such premise. Such access shall in no event include the interior of any residential dwelling unless otherwise provided by law.

## Chapter 5. Water Service Rates

### Section 1-5.010. Water Rates.

a) The District shall establish by Board resolution the specific rates, deposit amounts, water capitalization improvement fees, standby fees, reconnection fees, minimum usage amounts, and other fees and charges related to the provision of water services. Such rates, fees and charges shall be reviewed annually and may be amended only after a properly noticed public hearing is held to consider same, with adoption consistent with other changes to District Rules, and in compliance with Proposition 218. No increase in rates for <u>domestic, residential</u> water service may be imposed by the District without voter approval. . This section of the Bylaws may not be deleted or amended by any act of the Board, and may only be amended by the voters of the District at a regularly held election.

b) The Current fees, charges, and rates for service within the District are set forth in these Bylaws, and summarized here, subject to change as provided herein and existing State laws: For active residential customers, $39.00 per month, plus $1.75 per 1000 gallons after a base allotment of up to 12,000 gallons usage (for inactive residential customers, the availability fee is $20.00); For active commercial customers of "Tier 1", $165.00, per month, plus $1.75 per 1000 gallons, after a base allotment of up to 12,000 gallons per month usage (for inactive commercial customers, the availability fee is $35.00); For commercial customers of "Tier 2", $225.00 per month, plus $1.75 per 1000 gallons, after a base allotment of up to 12,000 gallons per month usage (for inactive commercial customers, the availability fee is $35.00); For governmental customers, $225.00 per month, plus $1.75 per 1000 gallons, after a base allotment of up to12,000 gallons per month usage (for inactive governmental customers, the availability fee is $55.00);. Other types of customers shall pay rates as determined by the Board on an individual basis, but in no case in an amount less than those for residential rates which is also the historical "minimum charge" for the District.

c) For purposes of this section, the term "commercial customers" shall apply to all entities, businesses, and corporations operating within the District, or facilities maintained by an entity, LLC, corporation, or business within the District, regardless if such entity, corporation, LLC, or business, is a "for profit" enterprise, which rests upon a parcel receiving water service, and which are, or would be, required to be located in or on land of any type of commercial zoning, or to have a license pursuant to Siskiyou County Ordinance, Chapter 3.04, save that none of the exemptions provided therein apply within the District.

d) For purposes of this section "governmental customer" means any facility owned, operated by, or occupied by a Federal or State agency, or any political subdivision of any State which receives water service within the District, or by provision of contract. This section shall also apply to any private contractor hired by, or operating on behalf of, any Federal or State agency, or any political subdivision.

### Section 1-5.020. Change in Water Rates – Notification.

No increase in rates per gallon for <u>domestic, residential</u> water service may be imposed by the District without voter approval, although increases in total fees and charges for service, so long as a net reduction results in the per-gallon cost of water, may be imposed by the Board upon Resolution. Notification of changes in water rates or fees shall be included in posted Agendas prior to the proposed effective date.

Anyone removing posted agendas shall be reported to law enforcement for vandalism. Notification may also be by memorandum on the water statement, or by publication. The voters of the district may also reject the imposition of any increased rates, fees, and/or charges by the referendum process, so long as rates remain sufficient to maintain the system and works, as provided by law. This section of the Bylaws may not be deleted or amended by any act of the Board, and may only be amended by the voters of the District at a regularly held election, and as otherwise provided by law, and by decisions of the Courts of this State.

### Section 1-5.030. Minimum Rates for Multiple Unit Buildings and Parcels.

Minimum gallonage and minimum rates for properties, buildings, or other structures with multiple units drawing water from, or occupied by persons using any water from, a single connection shall be calculated by multiplying the minimum base rate and minimum base usage gallonage for single customers by the number and type of units in such multiple usage situations, including mixed commercial/residential situations. This section shall specifically apply to apartments, hotels, trailer and mobilehome parks, and to all other residential or commercial properties having more than one residence, or that have one or more recreational vehicles, mobile homes, trailers, or other occupied, and/or inhabitable structures on the property in addition to the main residence. The presence of such structures on the property shall create a presumption of occupancy for purposes of the application of this section in any month billed, but which presumption may be challenged only by timely **written** appeal to the Board. For purposes of this section "timely written appeal" shall mean an appeal, in writing, sent by First Class Mail, overnight mail, FedEx, or other courier service, postmarked by the 15th day after the billing containing the challenged structure is mailed by the District to the customer. Any hearing relating to any challenged additional occupied and/or inhabitable structure shall be held before the Board at the next regular meeting, and a final determination of proper charges at that time. The district shall bill the residence(s) served by a single meter the base residential rate for each such residence, plus gallonage. The owner of any such properties shall have the option of installing service lines and individual meters to each structure described herein, but at their own cost for all materials, parts, housings, inspections, and labor involved.

Under no circumstances shall the Board waive any duly incurred, and properly imposed, water charges, monetary penalties, or fees in this section for any customer having more than one habitable structure on the property receiving water service, or for any customer failing to comply with the written, timely challenge requirements. Once adopted, this section of the Bylaws as it pertains to applying fees for multiple inhabitable structures, and prohibiting the waiver by the Board of any duly and properly imposed charges, penalties, and/or fees relating thereto, may not be amended by the Board without approval of the voters within the District voting on the question at a duly held election. Further, any Board member attempting to, or directing any staff to, waive or reduce any duly and properly imposed charge, penalty, and/or fee in this section without a timely written appeal and hearing before the Board, or without voter approval, shall be personally liable for any amount they so attempt to waive or reduce in a private action brought by any customer or resident of, or property owner within, the District in addition to any attorney fees and other costs incurred by any such person as a result of bringing such action.

## Chapter 6. Water Conservation
### Section 1-6.010. Intent.

It is the intent of the District to encourage the conservation of the District's water supply for the greatest public benefit, to minimize the wasteful use of water, and to make provisions for emergency rationing of water when necessary. No water restrictions may be imposed without certification by the Watermaster or General Manager that a severe shortage of water is imminent. Any restrictions imposed upon the use of

28

water shall be reasonably tailored, and the minimum necessary to preserve the service of water to the customers of the District. The District shall establish programs to assist customers with the conservation of water, and provide information to its customers concerning retrofitting of irrigation, and household facilities, as well as other steps they may take to minimize the use of water.

**Section 1-6.020. Wastage.**

No customer shall knowingly permit leaks or otherwise waste water. If the System Operator, General Manager, or any Director determines that water is being wastefully or negligently used on a customer's premises, and such use detrimentally affects the general service, written notice shall be given to the customer to correct the conditions within five (5) days. If such conditions are not corrected within five (5) days after giving the customer written notice, the District may discontinue water service until such time as the wasteful conditions have been corrected. Normal domestic uses of water, including the watering of landscaping and/or human food crops, shall not be considered wastage under any circumstances.

**SEVERABILITY**

If any provision of these Bylaws is found by a court of competent jurisdiction to be unconstitutional or otherwise inoperable, the remaining provisions of the Bylaws are valid unless the court finds the valid provisions of the Bylaws are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislative body (the HCSD Board) would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

# FINALIZATION AND ADOPTION

The revised Bylaws are hereby adopted at the meeting of the Board of Directors held on _4-18-14_ :

_Michele Hanson_ _____ President        _4-18-14_ Date

_Kimberly Olson_ _____ Secretary        _4-18-14_ Date

# FINALIZATION AND ADOPTION CERTIFICATION

**I certify the foregoing bylaws were approved by Resolution of the Board of the HCSD by vote of _4_ aye, to _1_ nay at the duly noticed meeting of the Board held on _April 18_ , 2014**

By: _Kimberly Olson_ _____        Date _4-18-14_
Secretary of the Hornbrook Community Services District

29

# EXHIBIT B

# EXHIBIT B

# EXHIBIT B

## ADOPTION OF NEW BYLAWS,  RESOLUTION #14-023

The Board of Directors of the Hornbrook Community Services District ("HCSD") do by this resolution recognize that the needs of the District have evolved over time, and that chronic lack of action by past Boards and employees has led to a state of near collapse of the District's water system and financial health. The Board finds that the District, and all customers thereof, will be best served by clearly stating major policies and procedures in new Bylaws, and providing for the protection of the Community by granting new authority to Community members to assist in maintaining a functional, and accountable District.  The Board of Directors of the HCSD do hereby adopt the proposed Bylaws, and direct the Secretary to provide a sealed copy thereof to County Counsel, along with the original Bylaws as amended in 1996, to County Counsel.

Ratified by resolution passed   4-18-14   , with   4   Ayes, and   1   Nays

## ONGOING PAYROLL ESTIMATE FOR INSURANCE,  RESOLUTION #14-024

The Board of Directors of the Hornbrook Community Services District ("HCSD") hereby finds that past Boards have been susceptible to unreasonable demands of past employees, and that the normal operation of the District requires only a few key employees, and part-time positions.  Further, past Boards have failed to avail themselves of the community resources available in the form of volunteers.  All such circumstances have unreasonably inflated the payroll of the District in the past, and so the Board, having taken action to correct the aforesaid deficiencies, does hereby declare that payroll for the HCSD during the fiscal year of 2014 - 2015 does not exceed $2,000.00 per month, and $24,000.00 per year.

Ratified by resolution passed   4-18-14   , with   3   Ayes, and   0   Nays

## CHANGE IN MONTHLY MINIMUM FEES/GALLONAGE,  RESOLUTION #14-025

The Board of Directors of the Hornbrook Community Services District ("HCSD") hereby finds that the minimum water charge of $39.00 for use of up to 12,000 gallons of water without additional charge is insufficient to timely and competently meet the needs of the District, and that excessive meter reads are a financial burden on the District for little or no return given the current rate structure.  The Board therefore does by this resolution reduce the overall water rate for minimum residential service by changing the minimum monthly residential charge to $45.00 per month for use of up to 15,000 gallons without additional charge, effective immediately.

Ratified by resolution passed   4-18-14   , with   4   Ayes, and   1   Nays

Certified:

*Kimberly Olsen*
Secretary of the Board, HCSD

4-18-14
Date

*Michele Hanson*
President of the Board, HCSD

4-18-14
Date